E-filing

1 **Robert J. Beles Bar No. 41993**
**John P. McCurley Bar No. 260179**
2 One Kaiser Plaza, Suite 2300
Oakland, California 94612-3642
3 Tel No. (510) 836-0100
Fax. No. (510) 832-3690

4
Attorneys for *Petitioner*
5 *WILLIS LAVONE CREECH*

FILED

JUL 27 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

6

7

8
United States District Court
9 Northern District of California

10

**C11-03670** CRB

11 WILLIS LAVONE CREECH,                    No.

12              *Petitioner*,              PETITION FOR WRIT OF HABEAS CORPUS;
                vs.                         VERIFICATION; MEMORANDUM OF POINTS
13                                          AND AUTHORITIES
     ROBERT H. TRIMBLE, Warden, Pleasant
14   Valley State Prison,

15              *Respondent*.

16   PEOPLE OF THE STATE OF CALIFORNIA,

17              *Real Party in Interest*.

18
                    **PETITION FOR WRIT OF HABEAS CORPUS**
19
                              **VERIFICATION**
20
            **MEMORANDUM OF POINTS AND AUTHORITIES**
21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Item                                               Page No.

TABLE OF AUTHORITIES ................................................. iii

PETITION FOR WRIT OF HABEAS CORPUS .............................. p-1

   1. Statement of Custody and Jurisdiction ................................ p-1

   2. Statement of Facts ................................................ p-2

      a. Introduction ................................................ p-2

      b. Prosecution Lay Witnesses ................................... p-2

         i. Reanna Creech ........................................ p-2

         ii. Jennifer Curry ........................................ p-3

         iii. Juliane Rush ......................................... p-4

         iv. Edward Quintero ...................................... p-5

      c. Police Officers .............................................. p-5

         i. Officer Fisher ......................................... p-5

         ii. Investigator James .................................... p-5

      d. Expert Witnesses ............................................ p-5

         i. Dr. John Thornton ..................................... p-5

         ii. James Norris ......................................... p-8

      e. Petitioner .................................................. p-9

   3. Claims for Relief ................................................. p-11

   4. Need for Habeas Relief ............................................ p-12

   5. Prayer for Relief ................................................. p-12

**VERIFICATION** ...................................................... p-13

MEMORANDUM OF POINTS AND AUTHORITIES ......................... m-1

   1. Standard of Review. ............................................. m-1

   2. There was Insufficient Evidence to Convict Petitioner of any of the Counts of
     Assault with a Firearm ............................................ m-2

   3. There was Insufficient Evidence to Support any of the Child Endangerment
     Convictions. ..................................................... m-11

i

1

2

4. Imposition of Aggravated Terms Violated Petitioner's Sixth and Fourteenth
Amendment Rights to Trial by Jury under *Cunningham v. California.*  . . . . . . . . m-13

    a. Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-13

    b. The Revised Determinate Sentencing System does not Comply with
    *Cunningham* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-13

5. Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-19

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

Cases                                                                      Page No.

3    *Apprendi v. New Jersey* (2000) 530 U.S. 466 .............................. m-14, 15

4    *Bell v. Cone* (2002) 535 U.S. 685 ......................................... m-1, 2

5    *Blakely v. Washington* (2004) 542 U.S. 296 ................................. m-15

6    *Bowen v. Roe*, 188 F.3d 1157 (9th Cir. 1999) ................................. p-1

7    *Briceno v. Scribner*, 555 F.3d 1069 (9th Cir. 2009) ......................... m-10, 12

8    *Clark v. Murphy*, 331 F.3d 1062 (9th Cir. 2003) ............................. m-1

9    *Clay v. United States* (2003) 537 U.S. 522 .................................. p-1

10   *Cunningham v. California* (2007) 549 U.S. 270 .................. m-13, 16, 17, 18, 19

11   *Fiore v. White* (2001) 531 U.S. 225 ..................................... m-9, 10, 12

12   *Herrera v. Collins* (1993) 506 U.S. 390 ..................................... m-2

13   *In re Lynch* (1972) 8 Cal.3d 410 ......................................... m-14

14   *In re Winship* (1970) 397 U.S. 358 ......................................... m-2

15   *Jackson v. Virginia* (1979) 443 U.S. 307 .............................. m-2, 9, 10, 12

16   *Lockyer v. Andrade* (2003) 538 U.S. 63 ..................................... m-2

17   *Nelson v. United States* (2009) 555 U.S. 350 ............................... m-15

18   *People v. Bekele* (1995) 33 Cal.App.4th 1457 .............................. m-2, 3

19   *People v. Black* (2005) 35 Cal.4th 1238 .................................... m-14

20   *People v. Chance* (2008) 44 Cal.4th 1164 ................................... m-3

21   *People v. Creech* (2010) 2010 Cal.App.Unpub. LEXIS 881 ..................... m-10

22   *People v. Johnson* (1980) 26 Cal.3d 557 .................................... m-2

23   *People v. Mosqueda* (1970) 5 Cal.App.3d 540 .............................. m-2, 3

24   *People v. Ranson* (1974) 40 Cal.App.3d 317 ................................. m-3

25   *People v. Sandoval* (2007) 41 Cal.4th 825 ................................. m-13

26   *People v. Sylva* (1904) 143 Cal. 62 ..................................... m-2, 3

27   *People v. Valdez* (2002) 27 Cal.4th 778 ................................... m-11

28   *Price v. Vincent* (2003) 538 U.S. 634 ................................ m-1, 11, 18

iii

*Rita v. United States* (2007) 551 U.S. 338 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-15

*United States v. Andrews,* 75 F.3d 552 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . m-10

*United States v. Booker* (2005) 543 U.S. 220 . . . . . . . . . . . . . . . . . . . . . . . . . . . m-13, 15-18

*United States v. Garcia,* 555 F.2d 708 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . m-2, 3

*United States v. Free,* 841 F.2d 321 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-10

*Williams v. Taylor* (2000) 529 U.S. 362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-1, 2

*Zepeda v. Walker,* 581 F.3d 1013 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

Statutes                                                                Page No.

18 U.S.C. section 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-15

28 U.S.C. section 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-1, 2, 11, 13, 18

CALCRIM 875 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-2

California Penal Code section 245 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1, m-2, 11

California Penal Code section 246 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

California Penal Code section 273a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1, m-11

California Penal Code section 1170 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-13, 17

California Penal Code section 12022.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

California Rules of Court, Rule 4.401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-17

California Rules of Court, Rule 4.420 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-14, 17

California Rules of Court, Rule 4.480 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-17

United States Constitution, Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-11

United States Constitution, Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . p-11, 12, 18

United States Constitution, Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . p-12, m-15, 18

United States District Court
Northern District of California

| | |
|---|---|
| WILLIS LAVONE CREECH, | No. |
| *Petitioner*, | PETITION FOR WRIT OF HABEAS CORPUS |
| vs. | |
| ROBERT H. TRIMBLE, Warden, Pleasant Valley State Prison, | |
| *Respondent*. | |
| PEOPLE OF THE STATE OF CALIFORNIA, | |
| *Real Party in Interest*. | |

## PETITION FOR WRIT OF HABEAS CORPUS

Comes now petitioner, by and through counsel undersigned, and petitions for a writ of habeas corpus.

### 1. Statement of Custody and Jurisdiction

1. Following a jury trial, petitioner, Willis Lavone Creech, was convicted of three counts of assault with a firearm (Penal Code section 245, subd. (a)(2)), felonies, four counts of shooting at an inhabited dwelling (Penal Code section 246), felonies, two counts of child endangerment (Penal Code section 273a, subd. (a)), felonies, and five firearm use enhancements (Penal Code section 12022.5, subd. (a)(1).) Petitioner was sentenced to 31 years, four months, in state prison. Petitioner is currently serving his sentence at Pleasant Valley State Prison.

2. Petitioner pursued a timely direct appeal. The First District Court of Appeal affirmed petitioner's convictions in an unpublished decision filed February 5, 2010. (First Appellate District case no. A122199.) The California Supreme Court thereafter denied petitioner's petition for review on April 28, 2010. (California Supreme Court case no. S180730.)

3. This petition is filed within one year plus 90 days of the final decision on direct review and is thereby timely. (See *Zepeda v. Walker*, 581 F.3d 1013, 1016 (9th Cir. 2009), citing *Bowen v. Roe,* 188 F.3d 1157 (9th Cir. 1999); *Clay v. United States* (2003) 537 U.S. 522, 531.)

1    4. Petitioner is presently in the custody of respondent, Robert H. Trimble, Warden,

2    Pleasant Valley State Prison.

3                                    **2. Statement of Facts**

4                                        **a. Introduction**

5    5. The charges arose from an incident occurring on September 15th, 2007, at about

6    10:00 am, in which petitioner fired a shotgun loaded with birdshot four times at a house located

7    at 5840 Dry Creek Road in Napa County, California. One shot broke a window; the other three

8    shots were fired at the front door and did not go through the door.

9    6. When petitioner fired the shots, his estranged wife, Reanna, their children Sofia and

10   Zachary, Reanna's sister Jennifer, Reanna's mother Juliane, and a workman were in the house.

11   The incident occurred after Reanna left petitioner with the two children and went to stay at her

12   parents' house. No one was injured.

13                              **b. Prosecution Lay Witnesses**

14                                   **i. Reanna Creech**

15   7. Reanna Creech testified that she had lived with petitioner and their two children, Sofia

16   and Zachary, in Modesto. Sofia was five and Zachary was three. (RT. vol. 14, p. 948.) Reanna

17   worked at Kaiser Hospital in Manteca and was going to school full time; petitioner had been

18   unemployed. (RT. vol. 14, p. 949-950.) During that summer, the two had argued on a number

19   of occasions. (RT. vol. 14, p. 951-952.)

20   8. In September, petitioner told Reanna that a number of the neighbors had bought guns

21   and that he has gotten one as well. Reanna laughed in disbelief and told petitioner she did not

22   believe him. Petitioner then showed Reanna the shotgun he had gotten. (RT. vol. 14, p. 953-

23   954.) Reanna was upset because the two had previously agreed that they would not have guns

24   in the house. (RT. vol. 14, p. 958-959.)

25   9. Shortly after Reanna learned that petitioner had acquired a gun, she decided to leave

26   him. She left on September 11, 2007, a couple of weeks after petitioner showed her the shotgun.

27   (RT. vol. 14, p. 964.) She and petitioner had had an argument and petitioner had left the house

28   for several hours. (RT. vol. 14, p. 967.) While petitioner was gone, Reanna packed up her car

1   and took the two children to her parents' house at 5840 Dry Creek Road in Napa County. (RT.
2   vol. 14, p. 969-973.)

3       10. On September 14, 2007, while Reanna was working at Kaiser Hospital, petitioner
4   came by her work and tried to see her. Reanna hid from petitioner, called security, the police
5   and her father. (RT. vol. 14, p. 974-979.) After petitioner left the Kaiser facility, he attempted
6   to call Reanna at her work number. She eventually decided voluntarily to speak with petitioner
7   over the phone; on September 14, 2007, Reanna accepted at least three calls from petitioner.
8   Petitioner was crying and pleading with her to see the children. (RT. vol. 14, p. 974.)

9       11. Over the phone, Reanna told petitioner that she and the couple's children were
10  staying at Reanna's parents' house. (RT. vol. 14, p. 986.) That evening, when she got off work
11  and drove to her parents' house, she saw petitioner's car parked by the gate. (RT. vol. 14, p.
12  996-997.) She drove away and petitioner followed her in his car for a while. (RT. vol. 14, p.
13  998-999.) Sheriff's deputies eventually called her and told her that petitioner was at her parents'
14  home and if she did not come there, they would have to release the children to petitioner. (RT.
15  vol. 14, p. 1001.) She returned, talked to the deputies, and petitioner left. (RT. vol. 14, p. 1004.)

16      12. The next morning, Reanna heard a sound as if someone had dropped a paint bucket
17  on a hardwood floor. She thought at first the construction worker had dropped something. She
18  then looked out the window and saw petitioner standing in front of the house with a shotgun.
19  (RT. vol. 14, p. 1005-1006.) Reanna cried out to her mother to grab Sofia. (RT. 1013.) She
20  grabbed Zachary and hid inside a bathroom with her sister Jennifer and Sofia. (RT. vol. 14, p.
21  1015-1016.) At some point, she heard another thud and the sound of glass breaking. (RT. vol.
22  14, p. 1016.) While in the bathroom, she heard two more shots. (RT. vol. 14, p. 1017.)

23      13. Reanna admitted on cross-examination that Sofia had no injuries or even bits of
24  broken glass on her and that Zachary was uninjured as well. (RT. vol. 14, p. 1052.)

25                              **ii. Jennifer Curry**

26      14. Jennifer Curry, Reanna's sister, was at her parents' house in Napa on the morning
27  of September 15th, 2007. (RT. vol. 14, p. 1076.) At about 11:30 that morning, she was in the

28

bathroom when she heard a loud bang. As she was going to the study / TV room[1] to get Sofia (RT. vol. 14, p. 1078-1079, 1083), she heard a second shot and the sound of breaking glass, and she saw glass flying in the study. Jennifer did not testify that she was in the study / TV room when she saw the glass flying. She grabbed Sofia, looked out the study window and saw petitioner standing in back of her car with a gun aimed at her and Sofia. (RT. vol. 14, p. 1084.) As she left the study with Sofia, she saw the gun follow her. (RT. vol. 14, p. 1086.) Jennifer then took Sofia to the bathroom. (RT. vol. 14, p. 1087.)

15. Jennifer's mother had her father's handgun but couldn't figure out how to fire it, so Jennifer took the gun, went to the outside porch, and fired a shot. Her mother then took the gun and fired a second shot. (RT. vol. 14, p. 1092.) There was only one shot that broke the window glass in the study. (RT. vol. 14, p. 1105.)

### iii. Juliane Rush

16. Juliane Rush, Reanna's mother, testified that on the morning of September 15, 2007, at about 11:30 am, she was in the dining room when she heard a loud pop. (RT. vol. 15, p. 1301.) She looked out a window and saw petitioner standing outside with a shotgun, she estimated about 14-15 feet from the house. (RT. vol. 15, p. 1304-1305.) She ran to lock the front door, and within seconds heard 3 or 4 more shots. She saw petitioner shooting toward the study / TV room. (RT. vol. 15, p. 1307-1308.) She asked the worker to call 911 and then ran upstairs toward the bathroom. (RT. vol. 15, p. 1310.) She obtained a handgun from a gun case at the top of the stairs and tried to fire a warning shot from an upstairs porch, but the gun wouldn't fire – a bullet rolled out of the gun and fell on the floor. (RT. vol. 15, p. 1312-1313.) Jennifer took the gun from her and fired a single shot from the porch toward the hillside. Juliane took the gun from Jennifer and fired a second shot. (RT. vol. 15, p. 1313-1314.)

17. Sofia was in the study / TV room directly in front of a table that was about seven feet from the window when Juliane heard the first shot. Jennifer was not in the study / TV room. (RT. vol. 15, p. 1320-1321, 1329.)

---

[1] This room, which was to the right of the front door, is alternatively referred to by the witnesses as the "study", "family room", or "TV room."

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

#### iv. Edward Quintero.

18. Edward Quintero, the construction worker who was in the house on the morning of September 15, 2007, heard a noise like a broom dropping or a loud pop. (RT. vol. 18, p. 2213.) He took a step towards the front door and then saw glass flying in the study / TV room. (RT. vol. 18, p. 2214.) The "little girl" was in that room when he saw the glass flying. One of the daughters went into the room and grabbed the little girl. (RT. vol. 18, p. 2215, 2223.) Quintero may have heard one shot after that. (RT. vol. 18, p. 2219.) He called 911. (RT. vol. 18, p. 2217.)

#### c. Police Officers

#### i. Officer Fisher

19. Officer Fisher responded to the scene and noticed that the front door had many small holes in it and that the window to the right of the door was broken. (RT. vol. 14, p. 1119.) He found three shotgun shells in the driveway. (RT. 1 vol. 14, p. 120.) He took photographs of the door and broken window. (RT. vol. 14, p. 1123.) He was able to see into the study / TV room from the outside of the house. (RT. vol. 14, p. 1130.)

20. The interior pane of the double-paned window in the study / TV room had a flaw at a point, cracks radiating from it, and had two triangular pieces of glass missing from it. (RT. vol. 14, p. 1137.) Officer Fisher did not find any broken pieces of glass on the rug of the study / TV room, or any pellet strikes anywhere inside the study / TV room. (RT. vol. 14, p. 1137.)

#### ii. Investigator James

21. Investigator James took pictures of the window of the study / TV room after the double glass pane had been replaced. He testified that he could see into the room from the outside. (RT. vol. 16, p. 1369.)

#### d. Expert Witnesses

#### i. Dr. John Thornton.

22. Dr. John Thornton, a prosecution expert criminalist, had a doctorate in criminalistics. He had worked as a criminalist for nine years and taught as a professor of criminalistics for 24 years. When he retired, he began working for the Napa Sheriff's Department as a criminalist and had worked there for 4 years at the time he testified. (RT. vol. 15, p. 1160.)

23. Dr. Thornton examined the scene to determine how far away from the house the shots were fired. He also conducted test firings of a shotgun using birdshot into blocks of gelatin to determine how far birdshot could penetrate into human tissue. (RT. vol. 15, p. 1167.)

24. Dr. Thornton described a shotgun cartridge as being composed of a plastic shell containing a plastic shot collar and pellets. When the cartridge is fired, the pellets and the collar are shot forward. (RT. vol. 15, p. 1172-1173.) The police had located four expended collars and three shells at the scene. (RT. vol. 15, p. 1175.) When a pump or slide action shotgun of the type used in the shooting is fired and the slide pulled backwards, the expended shell is ejected from the shotgun. Pushing the slide forward loads a fresh cartridge. (RT. vol. 15, p. 1178.)

25. He noticed many shotgun pellet defects to the front door and some birdshot embedded in the door. (RT. vol. 15, p. 1170.) Based on the number of pellet holes in the front door (just under 1200) and the number of pellets of birdshot in a cartridge (410), he determined that three shots had been fired at the front door. (RT. vol. 15, p. 1174, 1181.) There were not enough pellet holes in the front door to account for any more than three shots to the front door. (RT. vol. 15, p. 1190.)

26. The front door was solid, not hollow, made of hardwood, and was heavy enough so that one person could barely lift it without a dolly. (RT. vol. 15, p. 1196.) There was a small double-paned window in the front door, but only the outer pane was broken. Dr. Thornton did not notice any cracks or defects in the inner pane of the window in the front door. (RT. vol. 15, p. 1233-1234.) The pellets penetrated the front door less than an eighth of an inch. (RT. vol. 15, p. 1249.)

27. A fourth shot had broken both panes of the double-paned window of the study / TV room to the right of the front door. Dr. Thornton was unable to determine whether any of the pellets had gone inside the study where the broken window was, based on a sample from a sweeping that had been done of the room by Mrs. Rush. He did not personally find the pellets in the room and did not ask Mrs. Rush whether the sweeping had included pellets found between the two panes of the double-paned window. He admitted that he did not consider the possibility that the pellets could have come from the space between the two panes. The interior

pane of the window had been removed by the time he examined the scene. (RT. vol. 15, p. 1197, 1232-1233.)

28. Dr. Thornton determined that a total of four shots had been fired based on the evidence collected at the scene of three shells and four collars. The fourth shell was not found at the scene because it was probably not ejected from the shotgun, but taken away from the scene when petitioner left with the shotgun. The ejection of the shell is not automatic, but requires manipulation of the firearm (pulling the slide back.) (RT. vol. 15, p. 1178, 1196, 1241-1242.) An expended shell would have to be fully ejected from the shotgun before another cartridge could be loaded into the chamber. (RT. vol. 15, p. 1258.)

29. Dr. Thornton concluded that the three shots to the front door had been fired from a distance of between 40 and 50 feet, but the single shot to the window had been fired from a distance of about 20 feet. (RT. vol. 15, p. 1214.) He determined the distance of the shots to the door by measuring the distance of the three expended cartridges to the door and the dispersion of the three shot patterns on the door. (RT. vol. 15, p. 1214.) Dr. Thornton determined the distance of the shot to the window based on the distribution pattern / area of broken glass on the inner pane of the double glazed window, which was much smaller than the area of broken glass on the outer pane of the double-glazed window. (RT. vol. 15, p. 1214-1215.) Dr. Thornton believed that the larger area of broken glass on the outer pane was due to the impact of the shot rather than the distribution of the pellets. (RT. vol. 15, p. 1214-1215.) He admitted that the deputy had found pellet strikes in the stucco six and 3/8 inches below the windowsill. (RT. vol. 15, p. 1232.) He also acknowledged that the first pane would have stopped or slowed down some of the pellets. He had not calculated whether all of the pellets would have been stopped or slowed down by the first pane of glass. (RT. vol. 15, p. 1244.)

30. Dr. Thornton determined from the shot patterns that the shotgun was fired perpendicular to the front door. He was unable to tell whether the shotgun had been fired perpendicular to the window of the study / TV room, but suggested that the alignment of the broken areas of the outer and inner panes of the window suggested that the shot was fired perpendicular to the window, but he could not tell with any certitude. (RT. vol. 15, p. 1248,

1   1254.) He did not have an opinion about the sequence of the shots. (RT. vol. 15, p. 1220.)

2   31. Dr. Thornton acknowledged that the pellets that had been shot were small and were
3   of the type designed for shooting small birds. (RT. vol. 15, p. 1239.) Larger pellets, like
4   buckshot, would have done more damage, and a solid slug would have gone through the front
5   door "like butter", or would have gone through both panes of the window and lodged in the wall
6   behind the window. (RT. vol. 15, p. 1240.) He acknowledged that he had examined the "TV
7   room" (referred to as the "study" in previous testimony) where the window had been broken and
8   found no pellet strikes to any of the walls of the room, to the table near the window, or to any
9   of the items that were on the table, and no indication of any pellet strikes inside the room. (RT.
10  vol. 15, p. 1249.)

11  32. Dr. Thornton also performed ballistic gelatin tests with a comparable shotgun at 45
12  feet with no obstruction between the shotgun and the gelatin, and with a shotgun at 45 feet with
13  two panes of glass between the shotgun muzzle and the gelatin. The results were that birdshot
14  pellets penetrated the gelatin when the gun had no obstruction between it and the gelatin, but
15  did not penetrate the gelatin when two panes of glass were between the muzzle and the gelatin.
16  He did not conduct any gelatin penetration test at any other distance. (RT. vol. 15, p. 1222,
17  1226.)

18  ### ii. James Norris

19  33. James Norris testified as a defense criminalist. He had a masters degree in chemistry
20  and had worked as a criminalist for about 26 years for various police law enforcement agencies.
21  (RT. vol. 18, p. 2169-2174.)

22  34. Norris reviewed photographs and transcripts of the testimony, including Dr.
23  Thornton's, but did not inspect the scene. (RT. vol. 18, p. 2174-2175.) He concluded that the
24  shot to the window of the study/family room had come from the same location as the three shots
25  to the front door because the widest part of the dispersion of the pellet marks on the window
26  frame was approximately the same as that of the door. (RT. vol. 18, p. 2176.) The dispersion
27  would have been difficult to calculate based on the damage to the window glass itself, which
28  would break up in a way difficult to reconstruct and thus the distance of the gun from the

1  window more difficult to calculate than the distance of the gun from the door, but there were

2  pellet marks on the window frame at the bottom of the window and in the stucco below that.

3  (RT. vol. 18, p. 2178, 2179.) Based on the width of the dispersion of pellets, both the shots to

4  the door and the window were fired from about 50 feet away. (RT. vol. 18, p. 2184.)

5  35. Norris also noted that the shotgun wad had hit the front door and bounced straight

6  back, but had hit the window at an angle because it was not in front of the window. This

7  suggested that the shot to the window had been at an angle rather than perpendicular. (RT. vol.

8  18, p. 2177.)

9  36. Asked why a larger area of glass had been broken on the outer pane than the inner

10  pane of the window, Norris responded that the pellets had broken the outer window but not the

11  inner window. The broken area of the inner window could not have been the extent of the

12  dispersion of the pellets, because there were also pellet marks on the (outer) window frame.

13  (RT. vol. 18, p. 2186.) Given the dispersion of the pellets on the window frame, the shooter

14  wouldn't have been much closer to the window when he fired than to the door. (RT. vol. 18, p.

15  2188.)

16  ### e. Petitioner

17  37. Petitioner testified that he arrived at Reanna's parents' house around midnight on

18  the night of September 14 or early morning September 15, 2007 and asked her father, Mike

19  Rush, if he could see his children. Rush appeared angry, said petitioner could not see his kids

20  and raised a fist. Rush said, with his fists raised, "we can take care of that problem right now."

21  (RT. vol. 18, p. 2328.) Petitioner was afraid because he had just been threatened and he knew

22  that Rush had weapons inside the house. (Rt. vol. 18, p. 2329-2329.) Petitioner told Rush that

23  the police were waiting at the bottom of the hill, although they weren't, because he was afraid

24  and wanted to get off the property safely. (RT. vol. 18, p. 2329-2330.) When petitioner got into

25  his car, he got on his cell phone and pretended like he was calling the authorities, although his

26  cell phone had no signal; apparently, the house was at the top of a hill and petitioner could only

27  get a signal at the bottom of the hill, at the end of a long circle driveway. (RT. vol. 18, p. 2330.)

28

38. When petitioner got to the bottom of the hill, driving without his headlights on, he noticed a car, later determined to be a Prius, at the bottom of the hill with its headlights on. He thought Rush was driving the car. The car drove off and petitioner followed it for a distance, trying to get a signal on his cell phone. Petitioner thought Rush may have driven the other way down the hill to catch up to him and possibly hurt him because Rush was angry and had threatened him. (RT. vol. 18, p. 2330-2331.)

39. After driving behind the Prius for a short distance, it turned right off the rode and petitioner kept going straight for a while. Petitioner then made a U-turn, parked in the dark and called the police. (RT. vol. 18, p. 2330-2332.) The police came to petitioner's location, and two other vehicles–the Prius came back and a Mercedes arrived. Reanna was in the Prius and Rush in the Mercedes. Petitioner told the police that he had come to see his children and had been threatened off the property by Rush. (RT. vol. 18, p. 2332.)

40. Petitioner requested that he be allowed to speak with Reanna and Rush, but was told by one of the officers that Reanna did not want to talk to him. Rush apparently told the police that petitioner could come back and see his kids during "business hours." The police searched petitioner's car, and then after about 15 or 20 minutes everyone except petitioner left. (RT. vol. 18, p. 2334.) Petitioner stayed there thinking for a few minutes. (RT. vol. 18, p. 2335.) Petitioner drove home to Modesto that night. (RT. vol. 18, p. 2335-2336.)

41. Petitioner was angry that Rush had not allowed him to see his children and decided to come back and shoot at Rush's house to damage it. (RT. vol. 18, p. 2336.) He changed his clothes and rented a truck so that the police wouldn't recognize his car. (RT. vol. 18, p. 2336-2338.) He then got his shotgun and loaded it with birdshot because his intent wasn't to do major damage. (RT. vol. 18, p. 2338-2339.)

42. He then drove to 5840 Dry Creek Road, parked the truck at the gate, and walked onto the property, making sure that no one was around. When petitioner arrived the gate to the property was locked, which petitioner took to mean that no one was home. (RT. vol. 18, p. 2339-2340.)He walked through the dirt around the gate. He did not see Reanna's green Jetta or her parents' Prius, just a Durango SUV that he had not seen before. He didn't see any activity.

1    Again, to petitioner, this indicated that no one was home. (RT. vol. 18, p. 2340.)

2        43. When petitioner got to the top of the driveway he looked at the house, but did not

3    see anyone. (RT. vol. 18, p. 2341.) Petitioner approached the house slowly and made sure that

4    there was no one around and none of the vehicles that were normally at the house were there.

5    Not seeing anyone or any of the vehicles that would normally be there, petitioner concluded that

6    no one was home and started to move more quickly. (RT. vol. 18, p. 2341.) He shot the

7    window once and the door three times from the same position, standing 10 to 15 feet behind a

8    silver Jetta that was parked there, and about 40 to 50 feet from the house. (RT. vol. 18, p. 2341-

9    2342.) Firing the shots took less than ten seconds. After he fired the four shots, he took off

10   running. (RT. vol. 18, p. 2342-2343.) When he looked at the window, he saw the hillside

11   reflected in the glass, and no movement inside the room. (RT. vol. 18, p. 2343.) Petitioner is

12   nearsighted and was not wearing his distance glasses at the time. (RT. vol. 18, p. 2345.)

13       44. After leaving, petitioner drove to San Francisco, purchased a hacksaw, cut up the

14   shotgun, and disposed of the pieces. (RT. vol. 18, p. 2347-2348.) He then went to Hayward,

15   bought new clothes, and disposed of the clothes he was wearing. (RT. vol. 18, p. 2348.) He then

16   went to his parents' house. His father told him that Rush had called and complained that

17   petitioner was wanted on five counts of attempted murder. (RT. vol. 18, p. 2350.) Petitioner

18   became despondent, found a bottle of pills in the house, and took them. He was taken to the

19   hospital to have his stomach pumped. (RT. vol. 18, p. 2351-2352.)

20       45. Petitioner denied having any intention of killing or hurting any of the people in the

21   house that he shot at. His intention was simply to cause damage to the house (RT. 2354, 2475.)

22                                    **3. Claims for Relief**

23       46. There was insufficient evidence to support petitioner's conviction of three counts of

24   assault with a firearm in violation of petitioner's due process rights under the Fifth and

25   Fourteenth Amendments to the United States Constitution.

26       47. There was insufficient evidence to support petitioner's conviction of two counts of

27   child endangerment in violation of petitioner's due process rights under the Fifth and Fourteenth

28   Amendments to the United States Constitution.

48. The imposition of aggravated terms for petitioner's convictions violated petitioner's right to trial by jury under the Sixth and Fourteenth Amendments to the United States Constitution.

### 4. Need for Habeas Relief

49. Petitioner has no clear and speedy remedy at law, has exhausted his state remedies, and as such, federal habeas relief is appropriate.

### 5. Prayer for Relief

Wherefore, petitioner prays that this court issue a writ of *habeas corpus*.

Dated: Oakland, California, Wednesday, July 27, 2011.

**John P. McCurley**
Attorney for *Petitioner WILLIS LAVONE CREECH*

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

**VERIFICATION**

Petitioner is in custody and incarcerated outside the County of Alameda. I therefore verify the petition on his behalf. I declare under penalty of perjury that the facts set forth in this petition are true and correct based on my review of the official trial record of petitioner's case. Executed in Oakland, California, on Wednesday, July 27, 2011.

John P. McCurley
Attorney for *Petitioner WILLIS LAVONE CREECH*

**United States District Court**
**Northern District of California**

WILLIS LAVONE CREECH,

    *Petitioner,*

    vs.

ROBERT H. TRIMBLE, Warden, Pleasant Valley
State Prison,

    *Respondent.*

PEOPLE OF THE STATE OF CALIFORNIA,

    *Real Party in Interest.*

No.

MEMORANDUM OF POINTS AND
AUTHORITIES

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (hereafter "AEDPA")

became effective on April 24, 1996. Pursuant to AEDPA, when a state court adjudicates a

claim on the merits, federal courts can only grant federal habeas corpus relief when the state-

court adjudication was either: 1) "contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States,"

or 2) "based on an unreasonable determination of the facts in light of the evidence presented

in the State court proceeding." (28 U.S.C. section 2254, subd. (d); *Price v. Vincent* (2003)

538 U.S. 634, 638-639.)

A state court decision is "contrary to" federal law if it either "applies a rule that

contradicts the governing law" as set forth in Supreme Court opinions, or reaches a different

decision from a Supreme Court opinion when confronted with materially indistinguishable

facts. (*Williams v. Taylor* (2000) 529 U.S. 362, 405-406; accord, *Bell v. Cone* (2002) 535

U.S. 685, 694; *Clark v. Murphy,* 331 F.3d 1062, 1067 (9th Cir. 2003.).) A state court makes

an "unreasonable application" of federal law if the state court identifies the correct

governing legal principle from the Supreme Court, but unreasonably applies that principle to

the facts of the petitioner's case. (*Williams, supra,* 529 U.S. at p. 413; *Bell, supra,* 535 U.S. at p. 694; accord, *Lockyer v. Andrade* (2003) 538 U.S. 63, 71, "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only questions that matters under § 2254(d)(1) – whether a state court decision is contrary to, or involved an unreasonable application of, clearly established federal law.")

## 2. There was Insufficient Evidence to Convict Petitioner of any of the Counts of Assault with a Firearm

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. (*In re Winship* (1970) 397 U.S. 358, 364.) "A conviction based on evidence that fails to meet the *Winship* standard" is an "independent constitutional violation." (*Herrera v. Collins* (1993) 506 U.S. 390, 402.)

Evidence is sufficient to support a conviction only if, viewing all evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; see also *Winship, supra,* 397 U.S. at p. 364.) The same standard is used by California Courts in determining sufficiency of evidence. (See *People v. Johnson* (1980) 26 Cal.3d 557, 575-578.)

Petitioner was convicted of three counts of assault with a firearm under Penal Code section 245, subdivision (a)(2). To prove petitioner guilty of the the charge of assault with a firearm, the prosecution had to prove that: 1) petitioner did an act with a firearm that by its nature would directly and probably result in the application of force to a person, 2) petitioner did that act willfully, 3) petitioner was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone, and 4) petitioner had the present ability to cause a battery to the person he was charged with assaulting. (CALCRIM 875; *People v. Bekele* (1995) 33 Cal.App.4th 1457; *People v. Mosqueda* (1970) 5 Cal.App.3d 540, 544; *People v. Sylva* (1904) 143 Cal. 62, 64; *United States v. Garcia*, 555 F.2d 708, 712 (9th Cir. 1977).) Thus, for instance, a defendant cannot be

1 convicted of assault with a firearm if he points an unloaded or inoperable gun at his intended
2 victim and there is no evidence that he attempted to use the gun as a club to strike the victim
3 with. *(People v. Bekele, supra,* 33 Cal.App.4th 1457; *Mosqueda, supra,* 5 Cal.App.3d at p. 544;
4 *Sylva, supra,* 143 Cal. at p. 64; *Garcia, supra,* 555 F.2d at p. 712.) A defendant whose gun is
5 loaded but jammed has the present ability to injure his intended victim by shooting the gun if
6 he is able to clear the jam and chamber a round. *(People v. Ranson* (1974) 40 Cal.App.3d 317.)
7 Similarly, a defendant has a present ability to injure his victim by shooting his operable gun if
8 he hides and waits at a location that he believes his intended victim will appear, even if the
9 intended victim learns of the defendant's plan, sneaks up from behind the defendant, and forces
10 the defendant to drop the gun before the defendant can fire it. *(People v. Chance* (2008) 44
11 Cal.4th 1164, 1168.)

12 In the present case, there was insufficient evidence to prove that petitioner had the
13 present ability to injure anyone in the house with the gun—loaded as it was with birdshot—when
14 he fired it at the house.

15 The prosecution attempted to portray petitioner as a madman that attacked his own family
16 with a 12-gauge shotgun—a maniac that fired repeatedly into a house, while women and
17 children, including his wife and children, were trapped inside in a state of terror. However, the
18 evidence presented at petitioner's trial told a much different story. First, the evidence showed,
19 the particular weapon involved, a shotgun, is like a chameleon that can be anything from a
20 cannon to a BB gun depending upon the size of the shot pellets used. Here, the birdshot the gun
21 was loaded with rendered it much more like a BB gun than a cannon. The evidence tends to
22 show that the gun loaded with birdshot was incapable of penetrating to the inside of the house,
23 at least with the number of shots that were fired and the locations they were shot at.

24 Both the prosecution and defense experts agreed that the critical factor in the type of
25 damage a shotgun can cause is the type of shot in the cartridges that are loaded into it. Dr.
26 Thornton, the prosecution expert, testified that the damage depended on the size of the pellets.
27 At one extreme, a solid slug would have gone through the front door with no trouble and would
28 have gone through both panes of the window and lodged in the rear wall. (RT. vol. 15, p. 1240.)

1    Had petitioner wanted the shots he fired to enter the house, the best way to achieve that would

2    have been to use shells with solid slugs. At the other extreme is something called "dust", pellets

3    .04 inch in diameter (about 1/20 of an inch.) (RT. vol. 15, p. 1239.) Petitioner was using one

4    grade up from "dust", birdshot, .09 inches in diameter (about a tenth of an inch.) This is a type

5    of pellet designed for shooting small birds. In comparison, common double-ought buckshot, of

6    the type used for shooting large animals like deer and people, is .33 inch (about a third of an

7    inch.) (RT. vol. 15, p. 1239.) Dr. Thornton admitted that none of the pellets fired in the three

8    shots to the front door went through the door or even through the small, double-paned window

9    in the door. Indeed, the birdshot penetrated the wooden surface of the door to less than an eighth

10   of an inch deep and did not break the inner pane of the door window. (RT. vol. 15, p. 1233-

11   1234, 1249.) The birdshot used by petitioner was perfect for his stated purpose, to vandalize the

12   house. However, no one intending to hurt people inside the house would have chosen such an

13   ineffective method of doing so.

14       The fourth shot to the double-paned window in the TV room / study broke both panes

15   of the window. However, there was insufficient evidence that any of the pellets entered the TV

16   room / study, or that, if they entered, they entered with enough force to strike anyone in the

17   room. The only evidence that Dr. Thornton had that any of the pellets went into the room was

18   a sample taken from a sweeping or vacuuming of the room by Mrs. Rush. When he examined

19   the room, the inner and outer panes had already been removed. Dr. Thornton could not tell what

20   part of the room the pellets had come from or whether they had come from the room or the

21   spaces in between the two windows. (RT. vol. 15, p. 1197, 1232-1233.) When he examined the

22   room itself, he found no pellet strike marks on any of the walls of the room, to the table near the

23   window, or to any of the items that were on the table, and no indication of any pellet strikes or

24   marks inside the room at all. (RT. vol. 15, p. 1249.) Dr. Thornton admitted that the two panes

25   of glass would have stopped or slowed down some or all of the pellets. (RT. vol. 15, p. 1244.)

26   He could not tell whether all of the pellets had been stopped by the first pane of glass; he said

27   that he could have calculated this, based on the velocity of the pellets, but had not done so. (RT.

28   vol. 15, p. 1244.) Indeed, the defense expert, Norris, was of the opinion that the reason that the

m-4

1  broken area of glass was so much larger on the outer pane than the inner pane was because the

2  pellets had broken the outer window but not the inner window. (RT. vol. 18, p. 2186.) Thus,

3  both experts agreed, in effect, that the inner pane could have been broken by glass from the

4  outer pane rather than the pellets themselves.

5  No one inside the house was injured, and there was no evidence that Sofia, the child

6  allegedly in the TV room / study when the shot was fired at the window, got any broken glass

7  on her or that she was physically affected in any way by the shots fired. Reanna admitted that

8  she had checked Sofia for injuries and had not noticed any injuries or found any bits of glass

9  on her. (RT. vol. 14, p. 1052.)

10  Both experts agreed that the three shots to the front door were fired from about the same

11  place and at about the same distance from the house; There was a disagreement between the two

12  experts about the distance that petitioner fired the single shot at the window. Dr. Thornton

13  testified that the shots had been fired from 40-50 feet away (RT. vol. 15, p. 1214); Norris

14  testified that the shots had been fired from about 50 feet away. (RT. vol. 18, p. 2184.) Both Dr.

15  Thornton and Norris calculated the distance from the diameter of the shot dispersion. *Id.* The

16  two experts disagreed on the distance of the single shot to the window. Dr. Thornton calculated

17  the distance as 20 feet (RT. vol. 15, p. 1214), while Norris calculated the distance at 50 feet and

18  testified that the shot to the window had been fired from about the same location as the shots

19  to the window. (RT. vol. 18, p. 2184.) Again, both experts relied on the shot dispersion to show

20  distance. Dr. Thorton measured the shot dispersion based on the area of broken glass on the

21  inner pane of the window (RT. vol. 15, p. 1214-1215), while Norris discounted damage to the

22  glass as too difficult to reconstruct and based the shot dispersion on the widest dispersion of

23  pellet marks in the window frame and stucco below the window. (RT. vol. 18, p. 2176.) As the

24  area of damage to the inner pane was smaller than the width of the pellet markings on the frame

25  and stucco, Dr. Thornton's calculated a shorter distance than Norris'.

26  Both experts were highly qualified. Dr. Thornton had worked as a criminalist for 13 years

27  and taught as a professor of criminalistics for 24 years (RT. vol. 15, p. 1160), while Norris had

28  worked as a criminalist for various law enforcement agencies for about 26 years. (RT. vol. 18,

1     p. 2169-2174.)

2         Norris' opinion that all shots had been fired from roughly the same place was more

3 consistent with the testimony of the witnesses concerning the sequence of the shots than Dr.

4 Thornton's. Reanna testified that she heard an initial shot, a second shot accompanied by the

5 sound of breaking glass, and two more shots. (RT. vol. 14, p. 1005-1006, 1016, 1017.) Jennifer

6 testified that she heard an initial shot, followed by a second shot accompanied by the sound of

7 breaking glass. (RT. vol. 14, p. 1078-1079, 1083.) Juliane testified that she heard an initial shot,

8 followed by three or four more shots in which she saw petitioner pointing the gun toward the

9 TV room / study (RT. vol. 15, p. . 1301, 1307-1308.) Quintero, the workman, heard a initial shot

10 (RT. vol. 18, p. 2213), he took a step toward the TV room / study, then saw the glass breaking

11 in that room (RT. vol. 18, p. 2214), and may have heard one shot after that. (RT. vol. 18, p.

12 2219.) Thus, all four witnesses agreed that the first shot was not the one that hit the window of

13 the TV room / study, and three of the witnesses agreed that there were shots fired after the shot

14 that hit the window.

15         Based on Norris' reconstruction of the events, petitioner would have been standing in

16 roughly the same place when he shot the front door and then the window. Under Dr. Thornton's

17 version of the events, petitioner would have had to fire once at the door, move 20-30 feet closer

18 to the house, fire once at the window, and return to his former position to fire the remaining

19 shots at the door. The three empty shells were all in the same location, roughly 40-50 feet from

20 the front door – there was no empty shell 20-30 feet closer to the house than the other two.

21 Petitioner could, consistently with the physical evidence of the shell distribution, have fired

22 three shots at the door, ejected the three shells at that position, moved 20-30 feet closer, fired

23 the remaining shot at the window, and retreated with the unexpelled shell still in the shotgun,

24 but this does not agree with the testimony of the witnesses inside the house that they heard shots

25 after the shot to the window. Although Thornton's explanation is possible, it is highly unlikely

26 that petitioner fired from 40-50 feet away, moved to a position 20 to 30 feet closer and fired one

27 shot, then moved back to his original position and fired more shots. Norris' version of the

28 events is the only reasonable explanation based on the physical evidence and the testimony of

1    the witnesses.

2    Dr. Thornton conducted gelatin tests in an apparent attempt to prove that the birdshot that
3    petitioner fired outside the house could have injured someone inside the house. Thornton
4    testified that the gel block was the same consistency as human flesh and could be used to
5    determine the amount of damage gunfire would have done to a person. He fired birdshot at a
6    gel block 45 feet away with no obstructions in between and determined that the birdshot
7    penetrated the gel block. When he fired birdshot at a gel block 45 feet away with a double paned
8    window in between, no birdshot penetrated the gel block. The results of the first test, however,
9    were irrelevant. Petitioner was firing at the house from the outside and his purported victims
10   were inside the house; as such, a barrier existed between petitioner and the people inside the
11   house. Petitioner was not firing at the victims in the open, and as such, Dr. Thornton's first
12   experiment where he fired at the gel block directly provides no incite in the possible results of
13   the shots fired by petitioner. The second test, with the double-paned glass barrier, showed that
14   no one in the house could have been injured by any of petitioner's shots if Norris' figure for the
15   distance of the shot to the window was correct. As noted above, Norris' version is the only
16   reasonable explanation based on the evidence presented at trial.

17   However, even if Dr. Thorton's figure was correct and the shot to the window was fired
18   from 20 feet away rather than 40-50 feet away, there is still no evidence that any of the birdshot
19   could have hit someone in the TV room / study. For whatever reason, Dr. Thornton didn't
20   conduct a gel block test where birdshot was fired at a double-paned window from a distance of
21   20 feet with a gel block from about five feet behind the window, where Sofia was supposed to
22   have been relative to the window when the shot was fired. Had he done so, and had any of the
23   pellets reached the gel block, Dr. Thornton would have shown that petitioner had the present
24   ability to commit a battery on Sofia by firing birdshot through the window, and thus provided
25   evidence on which the jury could have based one of the three assault convictions. At least, based
26   on Dr. Thornton's version of the events where petitioner fired from two substantially different
27   positions and distances from the house. But Dr. Thornton didn't conduct this test, and there was
28   no other evidence showing that the birdshot could have reached anyone in the TV room / study.

1    As there was no evidence that the birdshot fired by petitioner could have contacted
2    anyone inside the house, there was no evidence that petitioner had the present ability to commit
3    a battery on any of the three victims charged in the information: Sofia, Jennifer, and Juliane.
4    Based on the evidence presented, it was shown that petitioner had the present ability to commit
5    a battery with the gun loaded with birdshot *had there been no barrier between petitioner and*
6    *the people inside the house*, but not if, as Norris theorized, the shots were fired at a distance of
7    40 to 50 feet with a double-paned window between petitioner and the people in the house. As
8    Dr. Thornton neglected to conduct tests aimed at reconstructing any other factual scenarios,
9    including his own theory of the events, there was no evidence presented at trial from which the
10   jury could conclude petitioner had the present ability to commit a battery on any of the
11   occupants of the house when he fired the birdshot.

12   Even if there had been evidence that the birdshot could have reached someone in the TV
13   room / study, (and there was none), there is no evidence to support the two convictions for
14   assault with a firearm involving Jennifer and Juliane. Jennifer testified that she was in the
15   bathroom when she heard the first shot, and as she was going to the TV room / study to retrieve
16   Sofia, she heard a second shot and saw the glass breaking in the TV room / study. She did not
17   testify that she was in that room when the glass broke. (RT. vol. 14, p. 1078-1079, 1083). Juliane
18   testified only that she looked through a window (not the window of the TV room / study) and
19   saw petitioner standing outside with the shotgun. She did not testify that petitioner made any
20   attempt to shoot at her through that window, and there was no evidence about the construction
21   of that particular window, whether it was double-paned as well, and whether petitioner had any
22   present ability to fire birdshot through that window. As such, there was clearly no evidence
23   from which the jury could possibly have concluded petitioner had the present ability to commit
24   a battery against Jennifer or Jennifer; to arrive at such a conclusion, the jury would necessarily
25   have had to rely on speculation.

26   Apart from the impossibility of injuring anyone inside the house by shooting at the
27   outside of the house with birdshot, the prosecution's theory that petitioner intended to kill the
28   occupants of the house was also fanciful. The prosecution originally charged three counts of

m-8

attempted premeditated murder, thus asserting that petitioner had the specific intent to kill Sofia, Jennifer, and Juliane. It is hard to imagine that anyone intending to kill the occupants of the house would arm themselves with shells of birdshot; as the name implies, shells only effective at killing small birds. Had petitioner intended for his shots to injury people inside the house, he could just as easily bought and loaded his gun with shells containing heavier shot, such as buckshot, or a solid slug. Moreover, if petitioner's goal was to hurt people inside the house, why did he not simply open the unlocked front door (Juliane testified the front door was unlocked) and shoot the occupants from inside the house. Of course, the jury was not convinced of the prosecution's theory that petitioner intended to kill anyone, as they acquitted petitioner of the attempted murder charges.

Although the crime of assault doesn't require the prosecution to prove petitioner had the specific intent to injure anyone, shooting at the outside of a house with birdshot is a bizarre way to assault someone if the assault was really directed against specific individuals. Petitioner's actions are much more consistent with intending to vandalize the house. The prosecution's theory that petitioner was a madman shooting at his own family with a 12-gauge shotgun trapped inside a house lacked any evidentiary support as there was absolutely no evidence showing that the birdshot fired from the gun could have injured anyone inside the house.

There was also insufficient evidence to establish that petitioner was aware of facts that would lead a reasonable person to believe his acts by their nature would directly and probably result in the application of force to someone. When petitioner arrived at the property where the house was located, the gate to the property was locked. When he approached the house, none of the cars that were normally there were present. Moreover, even as petitioner got close to the house, he never saw any movement or anyone in or near the home. As such, there were no facts from which a reasonable person would likely conclude that people were present inside the house, or even on the property.

A conviction is not supported by sufficient evidence if, "upon the record evidence adduced at the trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *(Jackson v. Virginia* (1979) 443 U.S. 307, 319; *Fiore v. White* (2001) 531 U.S. 225, 229;

*Briceno v. Scribner*, 555 F.3d 1069, 1078 (9th Cir. 2009); "Mere suspicion or speculation cannot be the basis for" a jury's conclusion that an essential element has been satisfied. *United States v. Free*, 841 F.2d 321, 325 (9th Cir. 1988); *United States v. Andrews*, 75 F.3d 552, 556 (9th Cir. 1996).) Conviction for a crime not supported by sufficient evidence is a violation of due process under the Fifth and Fourteenth Amendments to the United States Constitution. *(Jackson, supra,* 443 U.S. at p. 319; *Fiore, supra,* 531 U.S. at p. 229; *Briceno, supra* , 555 F.3d at p. 1078.)

In petitioner's case, there was insufficient evidence to show that petitioner had the present ability to commit a battery on any of the occupants of the house. Moreover, there was insufficient evidence showing that petitioner was aware of facts which would have led a reasonable person to believe his acts by their nature would directly and probably result in the application of force to someone. Thus, petitioner's convictions of three counts of assault were not supported by sufficient evidence.

In its decision affirming petitioner's convictions, the First District Court of Appeal stated:

> Here, Creech had the means and location to inflict serious injury on the occupants when he fired his shotgun at his father-in-law's home while he was standing 45 feet from the front door. He makes no compelling argument that his choice of ammunition lessened the dangerousness of his conduct or his ability to inflict injury, and the facts show otherwise.

*(People v. Creech* (2010) 2010 Cal.App.Unpub. LEXIS 881, at p. 18.) The court's statement, however, is not supported by the trial evidence. The prosecution failed to prove that petitioner had the "means and location to inflict serious injury on the occupants" of the house. As previously noted, the test Dr. Thornton conducted using the double-paned window as a barrier showed that the birdshot could not penetrate the barrier–this was the same material that was an actual barrier between petitioner and the occupants of the house. The test that Thornton conducted without the double-paned window showed that the birdshot could be dangerous if fired at a person directly with no barrier because it could penetrate the gel block used in the test, and as such the theory was that it could also penetrate a person's flesh. In the present case, there was a barrier between petitioner and the people inside the house; however, no test was conducted which showed that the ammunition used by petitioner could have penetrated that barrier.

The second part of the court's statement, that petitioner's argument that "his choice of ammunition lessened the dangerousness of his conduct or his ability to inflict injury," was not compelling, and that the "facts show otherwise," similarly lacks evidentiary support. The evidence from both the prosecution and defense expert clearly showed that the choice of ammunition when using a shotgun has a substantial effect on the dangerousness of the weapon and its potential to inflict injury, and the severity of any such injury. Moreover, both experts indicated that the ammunition used by petitioner was one step up from the least dangerous type of shotgun ammunition he could have used. Dr. Thornton testified that larger pellets, such as buckshot, would have done more damage, and that a solid slug would have gone through the front door like "butter," or gone through both panes of the window and lodged in the wall behind the window. (RT. vol. 15, p. 1240.) As such, there can be no question that petitioner's choice of ammunition lessened the dangerousness of his actions and his ability to inflict injury on those inside the house. In fact, there was no evidence presented from which the jury could have concluded that the birdshot could have actually entered the house.

As such, petitioner is entitled to federal habeas relief as the court's decision affirming his convictions of section 245, subdivision (a)(2), was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." (28 U.S.C. section 2254, subd. (d); *Price, supra,* 538 U.S. at pp. 638-639.)

### 3. There was Insufficient Evidence to Support any of the Child Endangerment Convictions.

To prove felony child endangerment under Penal Code section 273a, subdivision (a), the prosecution had to prove, among other things, that petitioner "caused or permitted the child to be endangered under circumstances or conditions likely to produce great bodily harm or death." (C.T. vol. 1. p. 289-290.) Under the situation presented in this case, it was more difficult to prove child endangerment than to prove assault with a firearm. As shown above, to prove assault, the prosecution only had to show that the birdshot pellets might have touched one of the victims named in the information. The prosecution did not have to show that the pellets would have even had to break the skin, let alone produce great bodily harm or death, since all that had

m-11

1 to be shown was a present ability to commit a battery. In contrast, to prove felony child

2 endangerment, the prosecution had to prove that petitioner's conduct was "likely to produce

3 great bodily injury or death." The statute is intended to protect children from abusive situations

4 where " ' "the probability of serious injury is great." ' " (See *People v. Valdez* (2002) 27 Cal.4th

5 778, 784.) Although there is no requirement that the injury actually occur, the situation must

6 be such that the *probability* of *great bodily injury* or *death* is *great*. (*Ibid.*)

7 There was no evidence that petitioner's son, Zachary, was anywhere near any of the doors

8 or windows. As petitioner was only using birdshot, for there to have been even a remote

9 possibility of being hit by a projectile while inside the house, Zachary would have to have been

10 near a door or window which was on the side of the house that petitioner shot at. The

11 prosecution failed to present any such evidence. Thus, there is absolutely no evidence showing

12 that petitioner's conduct was likely, and certainly not evidence that his actions carried a "great"

13 probability to produce great bodily injury or death to Zachary.

14 Even as to Sofia, since there was no evidence showing that the birdshot pellets could

15 have even touched her, there was no evidence that they could have produced great bodily injury

16 or death. As noted several times above, Dr. Thornton only conducted one test in which there was

17 a barrier between the shotgun he fired and the gel block; this was done from a distance of 45 feet

18 and showed that birdshot could not penetrate to reach the gel target under such circumstances.

19 Thornton simply did not conduct a test with the double-paned glass from any different distance.

20 Thus, there was no evidence presented from which the jury could have concluded there was a

21 "great" probability that the birdshot could reach Sofia and cause great bodily injury or death. To

22 reach such a conclusion, the jury would necessarily have to rely on speculation.

23 Like the assault convictions, the endangerment convictions were not supported by

24 sufficient evidence, so petitioner's convictions for endangerment also violated his right to due

25 process under the Fifth and Fourteenth Amendments to the United States Constitution. *(Jackson,*

26 *supra,* 443 U.S. at p. 319; *Fiore, supra,* 531 U.S. at p. 229; *Briceno, supra* , 555 F.3d at p.

27 1078.) As with the assault convictions, in affirming the petitioner's child endangerment

28 convictions, the appellate court based its decision on "an unreasonable determination of the facts

1  in light of the evidence presented" in petitioner's trial. (28 U.S.C. section 2254, subd. (d); *Price,*

2  *supra,* 538 U.S. at pp. 638-639.)

### 4. Imposition of Aggravated Terms Violated Petitioner's Sixth and Fourteenth Amendment Rights to Trial by Jury under *Cunningham v. California*

### a. Introduction

6  The imposition of aggravated terms in petitioner's case violated his Sixth and Fourteenth

7  Amendment rights to trial by jury under the United States Supreme Court decision in

8  *Cunningham v. California* (2007) 549 U.S. 270.)

9  *Cunningham* struck down the imposition of an aggravated term based on facts that were

10  found by the sentencing judge by a preponderance of the evidence instead of the jury, beyond

11  a reasonable doubt, as a violation of the Sixth Amendment right to jury trial. The California

12  Supreme Court in *People v. Sandoval* (2007) 41 Cal.4th 825, and by the Legislature in SB 40,[2]

13  Stats 2007 ch 3 § 2, codified as Penal Code sections 1170, subdivisions (a)(3) and (b), purported

14  to revise the existing sentencing system to give the superior courts discretion in imposing the

15  minimum, midterm, and aggravated term, reviewable on a reasonableness basis.

### b. The Revised Determinate Sentencing System does not Comply with *Cunningham*

18  As the California Supreme Court has predetermined that the SB 40 complies with

19  *Cunningham*, (See *Sandoval, supra,* 41 Cal.4th 825) this argument was raised in the California

20  Court of Appeal primarily for purposes of further review, although, given Supreme Court

21  developments concerning federal sentencing since *United States v. Booker* (2005) 543 U.S. 220,

22  it has grown increasingly likely that the Supreme Court will eventually find that the California

23  Legislature's "fix" does not comply with its directions in *Booker* and *Cunningham.*

24  Before 1976, California operated under indeterminate sentencing, a sentencing

25  philosophy driven by rehabilitation. Judges had the "discretion to impose sentences within

26

27  [2] SB 40 was the initial Legislative "fix" enacted in 2007 and set to expire on January 1, 2009. The Legislative

28  "fix" was renewed on September 27, 2008 as SB 1701, Stats 2008 ch 416, and is set to expire on January 1, 2011. For convenience's sake, however, petitioner will refer to the fix as "SB 40."

broadly defined ranges," which essentially set a statutory maximum term of confinement. The parole board, however, had the discretion to permit an inmate's early release. (*In re Lynch* (1972) 8 Cal. 3d 410, 413.)

In 1976, the Legislature enacted the determinate sentencing law in response to the perceived failure of rehabilitation and lack of uniformity of indeterminate sentencing. The DSL increased uniformity in sentencing structure by "limiting [the] range of sentencing options for each offense." (*People v. Black* (2005) 35 Cal. 4th 1238, 1246.) Different crimes were divided into prescribed categories, each category with its own lower, middle, and upper sentencing term. Under the DSL, a determinate sentence consisted of a base term, plus conduct and status enhancements. *(Black, supra,* 35 Cal. 4th at 1247.)

Before *Cunningham* was decided, California law presumptively imposed the middle term for a convicted defendant unless aggravating or mitigating factors justified imposition of the upper or lower term. (California Rules of Court, Rule 4.420, subd. (a).) During a trial's sentencing phase, the defense and prosecution could establish any mitigating or aggravating factors by a preponderance of the evidence. The judge would balance those factors and would depart from the presumptive term when warranted. (California Rules of Court, Rule 4.420, subd. (b).)

Problems first began in *Apprendi v. New Jersey* (2000) 530 U.S. 466. In *Apprendi*, the defendant pled guilty to two weapons charges that would have resulted in a ten-year maximum sentence. The judge, however, sentenced the defendant to twelve years prison after determining the existence of a hate-crime enhancement by a preponderance of the evidence. (*Apprendi, supra,* 530 U.S. at p. 471.) The Court in *Apprendi,* held that New Jersey's determinate sentencing law, which permitted the two-year increase, violated the defendant's Sixth and Fourteenth Amendment right to trial by jury: "[O]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *(Apprendi, supra,* 530 U.S. at p. 471.)

The sentencing scheme struck down in *Apprendi* closely resembled a California

1    sentencing court imposing an upper term by finding some aggravating factor to be true.

2    *Apprendi* was followed by *Blakely v. Washington* (2004) 542 U.S. 296, which defined

3    *Apprendi's* "statutory maximum" as the highest sentence that the defendant could receive based

4    solely on the jury's verdict or the defendant's guilty plea. (*Id.*) The "presumptive term" was

5    equivalent to California's midterm sentence – the Washington court had increased the sentence

6    after finding evidence of "deliberate cruelty." (*Blakely, supra,* 542 U.S. at p. 298.)

7    In *Booker, supra,* 543 U.S. at pp. 229-243, the Supreme Court determined that *Blakely*

8    applied to sentences under the United States Sentencing Guidelines. (*Booker, supra,* 543 U.S.

9    at p. 243.) Justice Breyer, a long-standing proponent of the Guidelines sentencing philosophy,

10    persuaded a majority of the Justices to save the Guidelines by making them advisory. The

11    majority agreed that advisory guidelines did not violate defendants' Sixth Amendment right to

12    a jury trial, although the judge rather than the jury decided whether to impose an aggravated

13    sentence. (*Booker*, 543 U.S. at p. 245.)

14    Justice Breyer's compromise prompted one commentator to remark that: "What *Booker*

15    *I* [the merits opinion] bestowed under the auspices of the Sixth Amendment, *Booker II* [the

16    remedial opinion] took completely away." (Model Penal Code: Sentencing 3 (Preliminary Draft

17    No. 4, 2005).) In later opinions, the Supreme Court has emphasized the discretion of the

18    sentencing judge over the recommended Guideline sentence. *Rita v. United States* (2007) 551

19    U.S. 338, held that while courts of appeals "may apply a presumption of reasonableness to a

20    district court sentence that reflects a proper application of the Sentencing Guidelines," "the

21    sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence

22    should apply." (*Rita, supra,* 551 U.S. at pp. 347, 351.) Instead, the sentencing court must first

23    calculate the Guidelines range, and then consider what sentence is appropriate for the individual

24    defendant in light of the *statutory* sentencing factors in 18 U.S.C. section 3553, subdivision (a),

25    explaining any variance from the former with reference to the latter. *Rita* was followed by the

26    Supreme Court in *Nelson v. United States* (2009) 555 U.S. 350, in which the Supreme Court

27    held that the sentencing court may not presume that a sentence within the applicable Guidelines

28    range is reasonable. (*Id.* at p. 350.)

1    In *Cunningham*, the United States Supreme Court held California's sentencing scheme

2  was nearly indistinguishable from the sentencing schemes invalidated in *Blakely* and *Booker*.

3  (*Cunningham, supra*, 127 S. Ct. 856, 858.) The Supreme Court held that either the judge needed

4  to be given broad discretion to choose a sentence within a set range, or a jury needed to be used

5  as the finder of any fact that could enhance a defendant's sentence. (*Id.* at 871 (quoting *Booker*,

6  *supra,* 543 U.S. at 265.)

7    In an attempt to address *Cunningham*, the Legislature enacted SB 40 to give sentencing

8  judges the discretion to impose the lower, middle, or upper term authorized by statute,

9  eliminating the mid-term presumption. The bill further stated that the legislative intent was to

10  address the Supreme Court's decision in *Cunningham*, and to "maintain stability in California's

11  criminal justice system while the criminal justice and sentencing structures in California

12  sentencing are being reviewed." (2007 Cal Legis. Serv. p. 4 (West).) The changes were meant

13  as a temporary measure until a sentencing commission could review California's sentencing law

14  and propose a long-term solution. (Assembly Floor, Committee Analysis of SB 40, at 5 (Mar.

15  26, 2007.).) However, the sentencing commission did not materialize, and the Legislature simply

16  extended the temporary changes in SB 40 without doing anything further concerning sentencing.

17  (SB 1701, Stats 2008 ch 416.)

18    The Legislature's solution does not comply with *Cunningham's* requirements for a

19  system with advisory sentencing guidelines where a judge has discretion to impose a sentence.

20  In *Booker*, the Supreme Court held that the Federal Sentencing Guidelines were unconstitutional

21  because they were mandatory, and not merely advisory. *Cunningham, supra*, 127 S. Ct. at p.

22  860.) The sentencing system approved in *Booker* was not one in which the sentencing judge's

23  "discretion" was limited to imposing a sentence within a range recommended by the Sentencing

24  Guidelines. This was the federal sentencing system prior to *Booker.* As *Rita* and *Nelson* make

25  clear, a federal sentencing court may not presume that the recommended Guideline sentence is

26  "reasonable," but may impose any sentence it wishes, subject to statutory restrictions regarding

27  minimum and maximum sentences, and subject to review by a federal appellate court on a

28  reasonableness basis. In contrast, the Legislature has kept the old rigid sentencing triad while

1    giving the sentencing judge the discretion to choose between the three terms. Imposition of one

2    of the terms is mandatory if the court does not place the defendant on probation.

3        Sections 1170, subdivision (a)(3) and (b) have not created a sentencing system

4    comparable to the revised Federal sentencing system approved as constitutional in *Booker* and

5    later cases, in which the guidelines are advisory and the judge has "broad discretion" to impose

6    a sentence. Under California's present system, the sentencing judge's discretion is severely

7    restricted. The judge is still limited to imposition of one of three terms. (California Rules of

8    Court, Rule 4.420.) California Rules of Court, Rules 4.401 to 4.480 still retain all of the old

9    sentencing factors. The restrictions on dual use of a factor and use of factors that are elements

10   of the crime are retained, (California Rules of Court, Rules 4.420, subds. (c) and (d)) so that in

11   this aspect, the sentencing system remains mandatory and not subject to the sentencing judge's

12   discretion. Under California Rules of Court, Rule 4.420, the judge is required to give "reasons"

13   for his or her choice among the three terms that correspond to the old "sentencing factors."

14       The record of petitioner's sentencing below makes it clear that, effectively, the pre-

15   *Cunningham* determinate sentencing system did not change. Neither the prosecution nor the

16   defense argued that the court had the discretion not to impose a term that a calculation of

17   sentencing factors might otherwise prescribe, but instead argued that the sentencing factors

18   indicated that imposition of aggravated or less than aggravated terms were appropriate. More

19   critically, the sentencing judge's discussion of her reasons for imposing aggravated terms was

20   indistinguishable from the kind of reasons a sentencing judge would have given under the old

21   determinate sentencing system, and the imposition of the aggravated terms was based entirely

22   on prescribed sentencing factors under the California Rules of Court. (C.T. 2949-2959.) The

23   sentencing judge did not consider any of the mitigation arguments that defense counsel raised

24   that did not fall within the sentencing factors. (Compare, C.T. 2951-2953 with defense counsel's

25   discussion of petitioner's social history at C.T. 381-386.)

26       Under *Booker* and *Cunningham,* a sentencing system based on "broad discretion" would

27   resemble the old indeterminate sentencing law accompanied by a set of advisory guidelines,

28   except that the sentencing judge would impose a specific term rather than an indeterminate

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

1   sentence. The Legislature's stop-gap revision of the determinate sentencing law is still one in
2   which the sentencing factors are presumptive rather than advisory. Under *Cunningham*,
3   presumptive sentencing factors must be found by a jury beyond a reasonable doubt, and thus
4   imposition of aggravated terms under the revised sentencing system still violates a defendant's
5   Sixth and Fourteenth Amendment rights.

6   The system created in an effort to comply with *Cunningham* operates essentially the same
7   as the pre-*Cunningham* system. The court looks to mitigating and aggravating factors listed in
8   the California Rules of Court, makes *factual findings*, and based on those findings imposes one
9   of three terms. Although section 1170 is vague as to how a court is to decide which term to
10  impose, the only logical starting point for any court is the mid-term, the same place it did under
11  the pre-*Cunningham* scheme. The court then makes factual findings, and based on those
12  findings, either bumps the sentence up to the aggravated term, or lowers it to the mitigated term.
13  As such, the new system has courts doing the exact same thing as they were doing before, just
14  under different labels; it has the same defects that *Cunningham* was concerned about: 1) the
15  court is doing fact finding in regard to factors which increase defendants' sentences rather than
16  a jury, 2) the facts are not determined beyond a reasonable doubt.

17  This is clear from the facts of this case. The court found a number of aggravating factors;
18  the offense was more serious than other instances of the same offense, the offense involved a
19  high degree of cruelty and callousness, the victims were particularly vulnerable, and the
20  petitioner abused a position of trust. (RT. vol. 21, p. 2946-2951.) The court, relying on these
21  factors among others, took almost every opportunity to impose aggravated terms; of course,
22  none of these factors were found by a jury and none found beyond a reasonable doubt, but these
23  factors were used to substantial increase petitioner's sentence. This is exactly what *Cunningham*
24  sought to guard against.

25  Accordingly, petitioner is entitled to federal habeas relief, as the sentencing scheme that
26  he was sentenced under is "contrary to, or involved an unreasonable application of, clearly
27  established Federal law, as determined by the Supreme Court of the United States," in
28  *Cunningham*. . (28 U.S.C. section 2254, subd. (d); *Price, supra,* 538 U.S. at pp. 638-639;

1 | *Cunningham, supra,* 549 U.S. 270.)

2 | ### 5. Conclusion

3 | For these reasons, petitioner is entitled to federal habeas relief and this court should issue

4 | a writ of habeas corpus.

5 |

Dated: Oakland, California, Wednesday, July 27, 2011.

6 |

7 |

8 |

9 | **John P. McCurley**
Attorney for *Defendant-Petitioner*
*WILLIS LAVONE CREECH*

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |