Robert J. Beles Bar No. 41993
John McCurley Bar No. 260179
Paul McCarthy Bar No. 139497
One Kaiser Plaza, Suite 2300
Oakland, California 94612-3642
Tel No. (510) 836-0100
Fax. No. (510) 832-3690

Attorneys for *Petitioner*
*WILLIS LAVONE CREECH*

# United States District Court
## Northern District of California
### San Francisco Courthouse

| | |
|---|---|
| WILLIS LAVONE CREECH,<br><br>       *Plaintiff*,<br>  vs.<br><br>P.D. BRAZELTON, Warden, Pleasant Valley State Prison,<br><br>       *Respondent*.<br><br>PEOPLE OF THE STATE OF CALIFORNIA,<br><br>       *Real Party in Interest*. | No. **3:11-CV-03670-CRB**<br><br>REPLY MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS |

**REPLY MEMORANDUM IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS**

ORIGINAL                                                                                          ORIGINAL

# TABLE OF CONTENTS

*item*                                                                                          *page number*

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

REPLY MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS.1

    1. There was insufficient evidence to support the assault convictions or related
    child endangerment convictions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

       a.  Assaults. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

       b.  Child endangerment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

    2. Petitioner's sentencing violated *Cunningham v. California*.. . . . . . . . . . . . . . .   9

       a. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

       b. The facts of the offenses showed that they were less serious than the
       average instance of such offenses would be.. . . . . . . . . . . . . . . . . . . . . .   10

       c. Petitioner had an insignificant criminal record. . . . . . . . . . . . . . . . . . .   12

       d. The sentencing court's findings of factors in aggravation were not
       harmless beyond a reasonable doubt.. . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

          (1) Threat of injury - vulnerable victims.. . . . . . . . . . . . . . . . . . . . .   12

          (2) Threat of great bodily harm, cruelty and callousness.. . . . . . . . . .   14

          (3) Taking advantage of a position of trust or confidence.. . . . . . . . .   16

    3. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

ORIGINAL                                                                    ORIGINAL

1

## TABLE OF AUTHORITIES

2        cases                                                          page number

3        *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). . . . . . .  9

4        *Butler v. Curry*, 528 F.3d 624 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

5        *Estrella v. Ollison*, 668 F.3d 593 (9th Cir. 2001.) ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

6        *Oregon v. Ice*, 555 U.S. 160, 129 S. Ct. 711, 172 L. Ed. 2d 517 (2009. . . . . . . . . . . . . . .  9

7        *People v. Bishop*, 158 Cal. App. 3d 373 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

8        *People v. Bloom*, 142 Cal. App. 3d 310 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

9        *People v. Chance* (2008) 44 Cal. 4th 1164. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 2

10       *People v. Edwards* (1981) 117 Cal.App.3d 436 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

11       *People v. Garcia* (1989) 209 Cal.App.3d 790 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

12       *People v. Hoover*, 77 Cal. App. 4th 1020 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

13       *People v. Hunter* (1925) 71 Cal.App. 315. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

14       *People v. Karsai*, 131 Cal. App. 3d 224 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

15       *People v. Loudermilk*, 195 Cal. App. 3d 996 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . .  13, 14

16       *People v. McGlothin*, 67 Cal. App. 4th 468 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

17       *People v. Raviart* (2001) 93 Cal.App.4th 258. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 3, 8

18       *People v. Reeder* (1984) 152 Cal.App.3d 900 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

19       *People v. Scott*, 9 Cal. 4th 331 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

20       *People v. Smith* (1979) 94 Cal. App. 3d 433. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

21       *People v. Valdez* (1985) 175 Cal.App.3d 103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 9

22       *People v. Vizcarra* (1980) 110 Cal.App.3d 858 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

23       *People v. White*, 117 Cal. App. 3d 270 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

24       *People v. Yslas* (1865) 27 Cal. 630. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 8

25

26

27

28

ii

ORIGINAL                                                                    ORIGINAL

*statutes and rules*                                                    *page number*

California Rules of Court 4.421(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13, 14

California Rules of Court 4.421(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

California Rules of Court 4.421(a)(11). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Penal Code section 245(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Reply Memorandum in Support of Petition for Writ of Habeas Corpus

ORIGINAL                                                                                    ORIGINAL

# United States District Court
## Northern District of California
### San Francisco Courthouse

WILLIS LAVONE CREECH,

              *Plaintiff*,

    vs.

P.D. BRAZELTON, Warden, Pleasant
Valley State Prison,

              *Respondent*.

PEOPLE OF THE STATE OF CALIFORNIA,

            *Real Party in Interest*.

No. **3:11-CV-03670-CRB**

REPLY MEMORANDUM IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS

## REPLY MEMORANDUM IN SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS

### 1. There was insufficient evidence to support the assault convictions or related child endangerment convictions.

#### a.  Assaults

Respondent relies on *People v. Chance* (2008) 44 Cal. 4th 1164, 1167-1168, which held that the "present ability" element of an assault under Penal Code section 245(a) is satisfied when "a defendant has attained the means and location to strike immediately." *Chance* further states that:

> ". . . 'immediately' does not mean 'instantaneously.' It simply means that the defendant must have the ability to inflict injury on the present occasion. Numerous California cases establish that an assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of that term."

*People v. Chance*, 44 Cal.4th at 1168.

In *Chance*, sheriffs arrived at a suspect's house to arrest him. The suspect ran out of his home away from the officers, carrying a handgun, and ran around the front end of a trailer. A sheriff anticipated that the suspect might be lying in wait and instead of pursuing the suspect around the front end of the trailer, proceeded around the back end of the trailer. He saw the suspect facing the front end of the trailer with the hand gun pointing forward. The sheriff

1

demanded that the suspect drop his gun several times and the suspect finally dropped the gun. The gun was fully loaded. It had no round in the firing chamber, but the suspect could have chambered a round by pulling back a slide on the gun. The Court of Appeal held that the suspect did not have the "present ability" to assault the sheriff because he was not pointing the handgun at the sheriff when the sheriff apprehended him. *People v. Chance*, 44 Cal.4th at 1169. The Supreme Court acknowledged that "temporal and spatial considerations are relevant to a defendant's 'present ability' under section 240", the suspect had the "present ability" in this situation because all he would have to have done is point the gun at the sheriff, chamber a round, and fire. *People v. Chance*, 44 Cal.4th at 1173.

The Supreme Court also discussed *People v. Valdez* (1985) 175 Cal.App.3d 103, which found a "present ability" to commit an assault when a suspect had tried to shoot a gas station attendant through a window. Unknown to the suspect, the window was made of bulletproof glass and deflected the shot. The Supreme Court agreed with *Valdez* that "present ability" to commit an assault is not negated because "injury turns out to be impossible for reasons unrelated to the defendant's preparations" where suspects "have acquired the means to inflict serious injury and positioned themselves within striking distance merely because, unknown to them, external circumstances doom their attack to failure." *People v. Chance*, 44 Cal.4th at p. 1174, quoting *People v. Valdez*, 175 Cal.App.3d at p. 112. The court similarly approved cases finding "present ability" where a defendant had started to pull a gun out of his sock but the victim had avoided the assault by jumping out the window of the house, where a victim had escaped a hatchet-wielding suspect by running into the next room and bolting the door, and where the victim had retreated around the corner of a house when he saw the suspect pointing a gun at him. *People v. Chance*, 44 Cal.4th at p. 1174-1175, citing *People v. Hunter* (1925) 71 Cal.App. 315, 318-319, *People v. Yslas* (1865) 27 Cal. 630, and *People v. Raviart* (2001) 93 Cal.App.4th 258, 267. The Supreme Court agreed with *Valdez* that a defendant would not have "present ability" where he was unable to complete the assault because he was armed with an unloaded or toy gun. *People v. Chance*, 44 Cal.4th at p. 1174, quoting *People v. Valdez*, 175 Cal.App.3d at p. 112.

The present case is clearly not like *Chance*, where all petitioner would have had to do aim the gun, chamber a round, and fire. Nor is it like *Valdez*, in which the unforeseen circumstance of a bullet-proof window prevented the defendant from completing the assault. There was no evidence that the fact that the house had a front door and storm windows would have been "unforeseen" by petitioner. Nor is the present case like *Hunter, Yslas*, or *Raviar*t, where the intended victim escaped the assault by jumping out of a window, running out of the room and locking the door behind him, or retreating around the corner of a house. There was no evidence that any of the victims, or anyone else, was outside the house when petitioner arrived, much less any evidence that an intended victim saw petitioner carrying his shotgun, ran into the house, and closed the front door. Nor was this a case where petitioner's ability to inflict any injuries on the victims was "impossible for reasons unrelated to the defendant's preparations."

All of the evidence shows that petitioner arrived at the house with a shotgun loaded with *bird shot*. The lack of injuries was because the bird shot was such a small and light caliber of shot that it could not penetrate a door or even get through a double-glazed window to injure anyone inside a house. The prosecution's expert admitted that bird shot is one of the smallest and least damaging shotgun calibers available, with a diameter of less than a tenth of an inch, and is intended only for shooting at small birds. The only smaller shotgun caliber the prosecution's expert discussed was something called "dust", which is shot whose diameter is .04 inches, approximately half the size of bird shot. (RT. vol. 15, p. 1239.) Bird shot would roughly be the same size as the head of a pin.

It was clear from the evidence that, although petitioner fired three shots at the front door of the house, none of the bird shot penetrated the door or could possibly have gone through the door. The only instance in which the bird shot might have gone inside the house was the one shot fired at the window of the study. Furthermore, it was agreed that petitioner was about 40-50 feet away from the front door when he fired the shots, based on the location of three ejected shotgun shells in the gravel driveway. (RT. vol. 14, p. 1118, 1128-1129, vol. 15, p. 1214.) The only dispute was the distance from which the shot at the study window was fired, the prosecution's expert placing petitioner about 20 feet closer to the house, and the defense expert

Reply Memorandum in Support of Petition for Writ of Habeas Corpus

ORIGINAL                                                                      ORIGINAL

placing him at about the same place as where the shots at the front door were fired. (RT. vol. 15, p. 1214, vol. 18, pp. 2176-2177.) )

Respondent inaccurately summarizes the trial record, stating that:

"Petitioner fired at least one shot into the study while Sofia was standing directly in front of the window. Ex. 2 at 1078-1083, 1327. . . . The shot penetrated both window panes and entered the room. Ex. 2 at 1170-1171, 1215-1218. . . . The shot blew out the study window, causing glass to go "flying everywhere." Ex. 2 at 1084, 1089-1090. Shot pellets were collected from the floor of the study. Ex. 2 at 1197, 1219."

Respondent's brief, p. 9.

No one could have been standing "directly in front of the window" because, as her aunt testified, there was a desk right next to the window taking up the space. (RT. vol. 14, p. 1081.) Sofia's aunt testified that Sofia was over to the left of the study, although still in front of the 7 foot wide window. (RT. vol. 14, p. 1081.) The vague and unquantifiable description of glass flying "everywhere" is the only evidence of even how far pieces of glass might have gotten into the study, because there was no evidence of where any piece of glass might have been found in the study. And, wherever Sonia was, there is absolutely no evidence that the bird shot penetrated both windows and entered into the room.

This issue was gone over in detail in the appeal and there can be no mistake here. On pages 1170-1171 of the trial transcript, the prosecution's expert described a photograph taken of the house and where the shotgun casings were found outside the house, stated that he found bird shot embedded in the front door, and described the composition of shotgun shells. He said nothing about finding bird shot inside the study. On pages 1215-1218, the prosecution's expert, apparently referring to police photographs, described a great deal of broken glass outside the window and a much smaller hole in the interior pane, described the large hole in the outer pane of the window and how it might have resulted, and stated that the interior pane had been taken out of the window by the time he examined the scene and was lying on the floor of the room with two triangular pieces of glass missing.  (The investigating officer described the break in the interior pane in greater detail as having a flaw at a point with cracks radiating from it and had two missing triangular pieces of glass. (RT. vol. 14, p. 1137.)

ORIGINAL                                                              ORIGINAL

Respondent's argument that the record shows that bird shot was collected from the floor of the study is especially inaccurate, unless respondent means from a box of sweepings and debris that was sitting on the floor of the study when the prosecution's expert arrived. The prosecution's expert testified that when he examined the study:

> ". . . the floor of the study had been cleaned up. There was no broken glass, there were no pellets. I inquired of the owner as to what cleaning up activities had taken place. She directed me to a box, a cardboard box of glass and debris and I also inquired if a vacuum cleaner had been used and I was informed that it had, and so I collected the contents of the cardboard box and of the vacuum cleaner and searched through that material for any lead pellets. I found quite a number of them."

(RT. vol. 15, p. 1197.) It is unclear from the expert's testimony whether he found bird shot in both the cardboard box of debris and the vacuum cleaner [1] contents or simply in the aggrate of the contents, but considering the pin-head size of bird shot, it appears very likely that any loose bird shot would have been vacuumed up rather than being physically picked up (with tweezers?) and put into the box of debris.  (There was some bird shot that had dissolved into "lead splashes" on the pieces of glass the expert found in the box, as discussed below.)

Although the prosecution's expert stated that he believed the bird shot came through the triangular piece in the interior pane, he also admitted that the inner pane had been replaced before he got there. (RT. vol. 15, p. 1197, 1232.) He therefore had to concede that he could not determine whether the bird shot in the sweepings had actually come from inside the room, or from the space between the exterior and interior panes of glass in the window. (RT. vol. 15, p. 1233.)

The prosecution's expert examined the interior of the room for marks that the bird shot would have made if it had entered the room, but could not find any marks. (RT. vol. 15, p. 1249.) He did, however, examine the broken pieces of glass that he believed came from the interior pane and found "lead splashes" on the pieces where the bird shot had struck the interior pane. (RT. vol. 15, pp. 1235-1236.) The prosecution's expert even found lead splashes on pieces

---

[1] The prosecution's expert assumed, of course, that the contents of the vacuum cleaner must have come *only* from the study. The individual who did the vacuuming did not testify about where she had vacuumed.

Reply Memorandum in Support of Petition for Writ of Habeas Corpus

ORIGINAL                                                                    ORIGINAL

of broken glass from the outer pane located in the bark **outside** the window, indicating that the outer pane also must have stopped at least some of the bird shot. He didn't "sieve the bark area[2] for pellets." (RT. vol. 15, p. 1256). Obviously, bird shot that turned into "splashes" on the surface of the window glass didn't make it through the glass, so there was positive evidence that the interior pane stopped some of the bird shot. Which, of course, suggests that we are dealing with an entirely different kind of ammunition with bird shot as opposed to a more typical kind of firearm discharge, since ordinary window glass does not turn bullets into silvery "splashes" on the window's surface.

Thus, the prosecution's expert, at most, was able to say that the bird shot **might** have entered the room and there was positive evidence that at least some bird shot was completely stopped by both the interior and exterior panes of glass. And there is no other evidence that bird shot pellets entered the room, even anecdotal.

The prosecution's expert performed some tests in which bird shot was fired at a jelly block that was supposed to simulate human flesh. His tests showed that the bird shot fired at a distance of 45 feet with no intervening glass penetrated the jelly block, and thus could have injured someone from that distance if there had been no obstructions. (RT. vol. 15, p. 1222.) When he repeated the test with two panes of window glass between the shotgun and the jelly block, the bird shot did not even reach the block. (RT. vol. 15, p. 1226.) Although the expert thought that petitioner was closer than 45 feet when he fired the bird shot at the study window, he did not repeat his jelly block test at any closer distance. (RT. vol. 15, p. 1226.) The most that can be said for the State is that the test was inconclusive, as the only inference one could draw from this is negative, that the test was not repeated at a closer range because the results would not have favored the prosecution.

There was evidence less helpful to the prosecution's case presented. The defense expert testified that the reason that the broken area of the inner pane was so much smaller than the corresponding area of the outer pane was that the bird shot broke the outer pane but not the

---

[2] Apparently the expert was referring to some kind of shredded bark mulch spread on the ground outside the house.

Reply Memorandum in Support of Petition for Writ of Habeas Corpus

ORIGINAL                                                                                     ORIGINAL

inner pane.  (The smaller portion of the inner pane would have been broken by glass pieces from the outer pane.) (RT. vol. 18, p. 2186.) He testified that the broken area of the inner pane could not have shown the dispersal of the actual bird shot because there were also pellet marks on the (outer) window frame outside the glass area and the stucco area below the frame, showing that the bird shot pattern was so wide that it went outside the area of the window. (RT. vol. 18, pp. 2186, 2178.)  (The triangular area of missing glass described by the investigating officer at RT. vol. 14, p. 1137 also seems inconsistent with a circular dispersion pattern of bird shot.)  The defense expert was also of the opinion that the shot had hit the window at an angle because the shotgun wad (a plastic cap that keeps loose shot in a shotgun shell) was found to the right of the window, suggesting that it had been fired from an area left of the window, hit, and been deflected to the right at an angle. (RT. vol. 18, p. 2177.) The dispersal pattern and trajectory of the wad would have put petitioner at about the same place he was when he fired at the front door, not closer to the house and directly in front of the window, as the prosecution's expert believed.  (RT. vol. 18, pp. 2176-2177.)

It is not this court's job to resolve conflicts in the evidence, of course.  But even if the defense expert's testimony about the distance from which the window shot was fired is disregarded, the plaintiff's expert still did not show that any bird shot actually entered the study.

Respondent also states that "when her aunt was taking Sofia out of the (TV) room, she could see Creech through the broken window tracking her with the barrel of his shotgun." (Respondent's brief, page 8.) But respondent omits the portion of the aunt's testimony in which she says that she saw petitioner standing "a little bit behind my car, so I couldn't see his legs", which she later agreed was "five feet behind the car" (RT. vol. 14, p. 1084, 1106.)  This was where Reanna Creech saw petitioner immediately after he had fired at the front door (like the aunt, Reanna only saw the upper half of petitioner's body, showing that petitioner would have been behind the silver Jetta rather than in front of it.  (RT. vol. 14, pp. 1008, 1013.) This would have placed petitioner at about the same position as the aunt saw him immediately after the shot hit the study window, indicating that the shot was fired from about the same position as the shots fired at the front door, like the defense expert thought.  Moreover, the aunt did not testify

7

that the gun was tracking her through the **broken** part of the window. The deputy who prepared the diagram of the scene did not measure how far the cars were from the house, and there were no cars parked in front of the house when the prosecution's expert examined the scene. (RT. vol. 14, p. 1135, vol. 15, p. 1253.)  There appears to be a lack of evidence in the record showing how far the aunt's car was from the house at the time the aunt saw petitioner, and thus how far petitioner himself was. Therefore, the evidence presented in the record was insufficient to determine whether petitioner had the present ability to injure the aunt. The same is true for respondent's argument that "Reanna looked out the front window, and saw Creech standing there with the shotgun", which respondent says is "undisputed" but gives no record citation (the testimony is at RT. vol. 14 p. 1006.) When asked where she saw petitioner standing, however, Reanna simply testified "enough that I could see him." and indicated that he was behind a silver Jetta automobile. (RT. vol. 14, p. 1008, 1015.) This was apparently the aunt's car, making her testimony similar to the aunt's except that the front window was not broken.

Respondent also apparently argues that petitioner had the "present ability" to injure the victims in the house because he could have entered the house and fired the bird shot directly at the purported victims, arguing that it is "irrelevant" that petitioner used bird shot because even bird shot can injure someone. Respondent relies on *People v. Raviart*, 93 Cal.App.4th at 267 , which it claims holds that the fact that victim "may have been sheltered, in whole or in part, by [a] building did not preclude the jury from finding defendant had the present ability to injure him." Respondent's brief, p. 8.  This is a selective quotation since, as shown above, *Raviart* is actually an "escaping victim" case in which the victim ran around a corner of a house to avoid being assaulted by someone with a gun. There is no evidence that petitioner attempted to enter the house. The evidence undisputedly shows that he remained at some distance from the house and fired bird shot at the house.

There is simply no California authority finding a "present ability" to commit an assault simply because a suspect could commit the assault if he first entered a house or other enclosed area.  As stated above, *Hunter, Yslas*, and *Raviart* all involve a suspect first confronting a victim in an area where the suspect could complete the assault, and the suspect retreating behind an

obstruction that blocked the suspect's assault.  If respondent's view was the law, there would have been no need for *Valdez* to mention that the suspect was prevented from completing the assault because the gas station attendant was behind bullet-proof glass that the assailant did not foresee. *Valdez* would simply have held that the suspect had a gun that was capable of injuring the attendant.

The Court of Appeal did not even suggest respondent's strained theory, simply finding, against the evidence presented at trial, that petitioner had the "means and location" to inflict injury on people inside the house when he fired at the house from the outside. The Court of Appeal's finding was clearly an unreasonable determination of the facts.

### b.  Child endangerment

The child endangerment convictions essentially depend on finding that petitioner had the present ability to assault the two children inside the house, and if the assault convictions fall, they fall too. Respondent's argument that there is no requirement that great bodily injury *actually* occur is an irrelevant straw. The prosecution had to show that petitioner's actions were "likely to produce great bodily harm or death," which requires a finding that petitioner had the present ability to commit a battery.

### 2. Petitioner's sentencing violated *Cunningham v. California.*

### a. Introduction

In *Oregon v. Ice*, 555 U.S. 160, 129 S. Ct. 711, 172 L. Ed. 2d 517 (2009), the Supreme Court held that *Cunningham* does not apply to consecutive sentences, so any consecutive sentence petitioner received cannot be addressed here.

The latest reported Ninth Circuit case construing *Cunningham v. California*, 549 U.S. 270, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007) is *Estrella v. Ollison*, 668 F.3d 593 (9th Cir. 2001), which respondent fails to discuss. *Estrella* is based on *Butler v. Curry*, 528 F.3d 624 (9th Cir. 2008) which respondent does discuss. Both *Butler* and *Estrella* held that the sentencing judges' imposition of aggravated terms violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), *Cunningham*'s precursor, and that the issue of aggravated terms should have been decided by a jury. However, both cases also held that *Apprendi* error is

ORIGINAL                                                                    ORIGINAL

harmless "when we can ascertain that a judge was presented with sufficient documents at sentencing—including the original conviction documents and any documents evidencing a modification, termination, or revocation of probation—to enable a reviewing or sentencing court to conclude that a jury would have found the relevant fact beyond a reasonable doubt." *Estrella v. Ollison*, 668 F.3d at 499, quoting *Butler v. Curry*, 528 F.3d at 647 n.14.

The sentencing error here was not harmless beyond a reasonable doubt for the following reasons:

### b. The facts of the offenses showed that they were less serious than the average instance of such offenses would be.

The record is clear that the size of the ammunition petitioner fired at the Rush house was the second smallest available, bird shot. The prosecution's expert, Dr. Thornton, testified that bird shot pellets are .09 inch in diameter (about $\frac{1}{11}$ inch), one step up from the smallest, "dust", at .04 inch in diameter ($\frac{1}{25}$ of an inch). (RT. vol. 15, p. 1239-1240.) In comparison, a .22 caliber bullet, the smallest generally available ammunition for handguns and rifles, is .22 inch in diameter, or about ¼ inch,[3] about 2 ½ times the diameter of bird shot. Buckshot, which plaintiff's expert testified is .33 inch in diameter (⅓ inch), slightly more than a .32 caliber bullet. Since bullets are typically cylinders that are longer than they are wide and shotgun pellets are like round balls, a .22 caliber bullet is considerably more than 2½ times the size of a bird shot pellet, probably about five or six times the size. The prosecution's expert was also clear that the larger the size of the bullet or shotgun pellet, the more damage it will do. He found that the bird shot pellets petitioner fired penetrated less than an eighth of an inch into the front door, even though a cloud of them were fired at the door, while a single 12 gauge shotgun slug would have gone through the front door "like butter." (RT. vol. 15, p. 1240.) The prosecution's expert acknowledged that bird shot is generally suitable only for hunting small birds. (RT. vol. 15, p. 1239.) Since the crime of shooting at an inhabited dwelling (section 246) covers all sizes of bullets, shooting at an inhabited dwelling using only bird shot would logically be a less serious instance of the crime than average.

---

[3] The term "caliber" refers to the diameter of the a bullet or round in inches.

ORIGINAL                                                                ORIGINAL

Section 246 is codified in Title 8, Chapter 9 of the Penal Code dealing with assaults against the person. The seriousness of a section 246 offense is not because the bullet might damage the dwelling structure but because of the danger of injury to a person who might happen to be inside. Shooting at an inhabited dwelling using bird shot, which has little chance of penetrating the exterior, would, again, logically be a less serious instance of the crime than average.

The record of the trial bears this out. There was no evidence that anyone in the house was injured, of course, or even touched by flying glass from a broken window. Thus, the only evidence of possible risk to the occupants inside the Rush house from the bird shot was the testimony of the prosecution expert, who admitted that none of the three shots fired at the front door penetrated more than an eighth of an inch into the wood. (RT. vol. 15, p. 1249.) The front door had a small, double paned window in it, but only the outer pane was broken by the pellets; the inner pane was undamaged. (RT. vol. 15, p. 1233-1234.)

As for the remaining shot fired at the double glazed window of the study, the prosecution's expert was unable to tell whether any of the pellets from the shot fired at the double paned window of the study even continued into the interior of the room, let alone whether the pellets would have had enough force to have injured anyone in the room. All that the prosecution's expert was able to tell was that the bird shot pellets broke out a larger area of the outer pane and a smaller area of the inner pane. (RT. vol. 15, p. 1214-1215.)

The prosecution's expert and the defense expert agreed on almost all details except the distance that petitioner was from the house when he fired the shotgun at the study window. The prosecution's expert placed him 20 feet closer based on his assumption that the broken area of the inner pane corresponded to the dispersal of the bird shot. The defense expert placed petitioner 20 feet further away based on his conclusion that the broken area of the outer pane and pellet patterning on the wooden window frame below the glass corresponded to the shot's dispersal. (RT. vol. 15, p. 1214, vol. 18, p. 2184.)  But even under his version, the prosecution's expert couldn't determine whether any of the bird shot actually entered the interior of the room when the shot was fired. His jelly block tests showed only that petitioner could have injured

Reply Memorandum in Support of Petition for Writ of Habeas Corpus

someone inside the house with bird shot if he had fired through an open window or entered the house. (RT. vol. 15, p. 1222, 1226.)

There was no evidence that the windows in the house were made with any special sort of bullet proof glass, or were anything more than standard double-glazed windows.

The trial evidence of not only the lack of injury but the lack of any possibility of injury also showed that because the caliber of ammunition fired was so low that this instance of shooting at an inhabited dwelling was less serious than average. In the present case, where there was no evidence that any of the bird shot penetrated the outer wall of the Rush home, the only difference in the number of people present inside the house and the number of shots fired is that the occupants were allegedly frightened by the shots. Shooting a heavier caliber that had a chance of penetrating the wall of at an occupied house would obviously be a more serious instance of the offense of shooting at an inhabited dwelling than what occurred here.

Petitioner has argued that there was insufficient evidence to support convictions of the assault and child endangerment charges.  Even if the court was to assume that there was technically sufficient evidence to sustain the charges, a reasonable jury would not have found aggravating factors true on the evidence presented, beyond a reasonable doubt.

### c. Petitioner had an insignificant criminal record.

Petitioner's criminal record consisted of a single conviction for delaying a police officer (presumably Penal Code section 148) for which he received a jail sentence and no probation. (C.T. 383.) The probation report found this insignificant. (C.T. 433.)

### d. The sentencing court's findings of factors in aggravation were not harmless beyond a reasonable doubt.

Petitioner's use of lightweight bird shot, the fact that no one was injured, the lack of evidence that anyone was put at risk of injury by the bird shot, and his insignificant criminal record should have resulted in imposition of mitigated terms or at most the midterm with no consecutive sentences. Yet the sentencing court went to the other extreme, taking almost every opportunity to impose aggravated terms, resulting in a sentence of 31 years and four months.

### (1) Threat of injury - vulnerable victims

This sentencing factor is contained in California Rules of Court 4.421(a)(1), (a)(3). The court found that the offense was more serious than average because petitioner used "a Mossberg, 12 gauge, 500-A shotgun" and because the 6 individuals in the house were "extremely vulnerable." (RT. vol. 21, pp. 2946-2947.) Such conclusions suggest that the court utterly failed to understand the evidence that the trial brought out.

The gauge of the shotgun was insignificant compared to what the shotgun was loaded with. As the prosecution's expert testified, a shotgun can be anything from a bird-shooter to a cannon, depending upon the size of the pellets it is loaded with. Petitioner's shotgun was configured as a bird-shooter, not a cannon. That the gun was a "12 gauge" only meant that it could fire more pellets than a shotgun of a higher gauge, and this fact loses its significance when what is being fired is bird shot from the outside of a house.

The sentencing court finding the six people in the house "vulnerable" was not harmless. The people in the house were not "vulnerable" at all, if by "vulnerable" one means subject to a risk of physical injury greater than the average risk involved in shooting at a dwelling. A victim is "particularly" vulnerable only if he is vulnerable to a "special or unusual degree, to an extent greater than in other cases." *People v. Loudermilk*, 195 Cal. App. 3d 996 (1987). A victim is not "particularly" vulnerable where all victims of the crime of conviction are vulnerable in the same manner. *People v. Bloom*, 142 Cal. App. 3d 310 (1983) (stating that "[a]ll victims of drunk drivers are 'vulnerable victims'").

> "Moreover, in the overwhelming majority of cases, 'particularly vulnerable victims' have had inherent personal characteristics that, sometimes in combination with the manner in which the crime was committed, render them more vulnerable than other victims. See, e.g., *People v. Bishop*, 158 Cal. App. 3d 373, 204 Cal. Rptr. 502, 505 (Ct. App. 1984) (victims were very young and of small stature); *People v. McGlothin*, 67 Cal. App. 4th 468, 79 Cal. Rptr. 2d 83, 87 (Ct. App. 1998) (the victims were particularly vulnerable because they were elderly and were attacked in a parking lot late at night); *People v. Karsai*, 131 Cal. App. 3d 224, 182 Cal. Rptr. 406, 416 (Ct. App. 1982) (victim was young and physically weak); *id.* ('While age and physical traits are not the only factors which may indicate particular vulnerability, they are the most obvious.').

> The California courts have in a few cases relied on aspects of the status of the victim that are more changeable than age or physical frailty, but have done so only when the victim was seriously, if only temporarily, incapacitated. *People v. Hoover*, 77 Cal. App. 4th 1020, 92 Cal. Rptr. 2d 208, 215-16 (Ct. App. 2000) (extremely intoxicated victim in domestic violence case); *People v. White*, 117 Cal.

App. 3d 270, 172 Cal. Rptr. 612, 618 (Ct. App. 1981) (shooting a victim already incapacitated from earlier gunshot), abrogated on other grounds by *People v. Scott*, 9 Cal. 4th 331, 353 n. 16, 36 Cal. Rptr. 2d 627, 885 P.2d 1040 (1994); *Loudermilk*, 241 Cal. Rptr. at 214 (sleeping victim); [*People v.*] *Smith* (1979) 94 Cal. App. 3d 433, 156 Cal. Rptr. [502] at 503 (sleeping victims)."

See *Butler v. Curry*, 528 F.3d 624, 649 (9th Cir. 2008) (concluding that victim was not "particularly vulnerable" simply because she was attacked from behind.)

While two of the victims were children, that characteristic did not render them more "vulnerable" than the four adult victims. Even in a case of unrestricted shooting at a distance, the children would have been, if anything, less vulnerable, since they would have presented smaller targets. Petitioner, however, fired at the outside of the house with bird shot. Given the lack of evidence that the bird shot penetrated the house, the six individuals might as well have been somewhere else.

### (2) Threat of great bodily harm, cruelty and callousness.

The trial evidence showed that there was no risk that any of the six individuals in the house could have suffered great bodily harm. As for "cruelty" and "callousness", California Rules of Court 4.421(a)(1) treats "cruelty and callousness" as a general term of which "great violence", "great bodily harm", "threat of great bodily harm" are examples. Cases upholding enhancements based on "cruelty" or "callousness" invariably base this either on the presence of bodily harm or the threat of great bodily harm exceeding what is inherent in the crime. See, e.g., *People v. Vizcarra* (1980) 110 Cal.App.3d 858 (threat to cut victim with a knife), *People v. Edwards* (1981) 117 Cal.App.3d 436 (direct threat to kill during an armed robbery), *People v. Reeder* (1984) 152 Cal.App.3d 900 (choking, threatening to break every bone in her body, and threatening to kill her if the crime was reported), *People v. Garcia* (1989) 209 Cal.App.3d 790 (in a rape case, defendant punching, slapping, and dragging victim by hair, throwing her into the bushes and ripping off her clothes.)

The trial court justified its finding of "cruelty and callousness" by finding: "He used live ammunition and shot ***into*** a house where he knew that his wife and children were staying." (RT. 2949, emphasis added.) This was an unreasonable determination of the facts and was not harmless. Petitioner fired "at" the house, but (at the risk of being repetitive), there was no

evidence presented at the trial that petitioner shot "into" the house, if by "into" the sentencing court meant "into the interior", and petitioner testified that he believed no one was at home. (RT. vol. 21, p. 2339.) The three shots fired at the door did not go "into" the house and The prosecution's expert could not tell if any of the bird shot fired at the window of the study went through the inner pane of the window into the interior of that room. Since there was no evidence that petitioner's conduct created any risk of harm to the people inside the house, the trial court's finding of cruelty / callousness could only have been based on petitioner's frightening the individuals. Although the individuals said that they were frightened by the gunshots, merely frightening someone without more does not support a finding of cruelty and callousness under California case law

> The court also justified the finding of cruelty and callousness by finding:

> "When he says that his entire motivation for shooting at the house was simply to vandalize the house and pay back Mr. Rush, I don't find that that's credible at all. He took no action, whatsoever, to ensure that he wasn't going to be threatening great bodily harm to anybody in that house."

(RT. vol. 21, p. 2950.) This was an unreasonable determination of the facts and was not harmless. Petitioner testified that he deliberately loaded his shotgun with bird shot because his intent wasn't to do major damage. (RT. vol. 18, p. 2338-2339.) He did not try to enter the house, but stood at a distance and fired three of the four shots at the front door. Considering this, not only is the finding contradicted by the evidence, but it is difficult to understand why the sentencing court would make such a finding. Petitioner can only conclude that the trial court simply did not understand what bird shot was, despite the extensive testimony by both the prosecutor's and defense experts on the subject. Apparently, the court simply understood that petitioner fired a shotgun at the house and thought that the failure of the blasts to penetrate the front door or enter the study was some freak occurrence. The sentencing court also justified its finding of cruelty by finding that *if* petitioner had been closer to the house, someone would have suffered great bodily injury. (RT. vol. 21, p. 2950.) This makes as little sense as finding that if petitioner had used buckshot, entered the house and fired directly at people, or waited until someone came outside, someone would have suffered great bodily injury. The sentencing court

justified a harsh sentence because of something petitioner didn't do. And since there was no evidence of how close petitioner would have had to get to the house before the bird shot pellets could penetrate and strike someone inside, this finding is meaningless as an assessment of possible risk from petitioner's conduct. The prosecution's expert's jelly block test showed that someone could be injured if bird shot was fired from 45 feet away with no intervening obstructions, but that the bird shot would not reach the jelly block from 45 feet away if a double paned window was in between. The prosecution's expert did not attempt a jelly block test through a double paned window at some lesser distance, nor did he even offer an opinion that bird shot fired at a double paned window from a particular distance would go through that window and injure someone standing on the other side.

### (3) Taking advantage of a position of trust or confidence.

This factor is contained in California Rules of Court 4.421(a)(11). The trial court's finding that petitioner "took advantage of a position of trust or confidence" (RT. vol. 21, p. 2951) is similarly not supported by the record, was an unreasonable determination of the facts, and was not harmless. On the same page, the trial court also found that the incident was a "sneak attack" on the house because petitioner hadn't "called at the house" first. If petitioner had "called at the house" first  – if he'd knocked on the door and asked to be let inside, or if he'd called with an excuse that he'd dropped something in the driveway and needed to retrieve it – a court might have found that used his position of trust or confidence to put the occupants off their guard. But petitioner didn't do anything like that. He simply parked his truck outside the gate, walked up the driveway, and shot at the outside of the house unannounced. A complete stranger whom the victims had no "trust or confidence" in could have done the same thing.

### 3. Conclusion

This case is an aberration that hopefully the courts will not see often. Petitioner should not have been convicted of multiple counts of firearm assault and child endangerment and sentenced to thirty-one years and four months for firing ***bird shot*** at the outside of his father in law's house from a distance. This is an abnormal, irrationally harsh result that is about as far removed from the typical firearms assault or case of shooting at an inhabited dwelling as one

could get.  The prosecution'sIf this were the law, irresponsible youths who fire BB guns at a neighbor's house would be risking long prison sentences.

For these reasons, this court should issue a writ of habeas corpus setting aside the assault and child endangerment convictions or, if it finds sufficient evidence to support those convictions, setting aside all aggravated terms and requiring any sentencing court to substitute mid-term sentences.

Dated: Oakland, California, Thursday, April 12, 2012.


Robert J. Beles
Paul McCarthy
Attorneys for *Petitioner WILLIS LAVONE CREECH*

17