IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIS LAVONE CREECH,<br><br>    Petitioner,<br><br>v.<br><br>ROBERT H. TRIMBLE, Warden, Pleasant Valley State Prison,<br><br>    Respondent.<br><br>PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Real Party in Interest. | No. CV 11-03670 CRB<br><br>**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |

In 2008, a jury convicted Willis Lavone Creech of three counts of assault with a firearm, four counts of shooting at an inhabited dwelling, and two counts of child endangerment. Creech now petitions for a writ of habeas corpus, contending that (1) there was insufficient evidence to support his convictions for assault with a firearm and child endangerment, and (2) the imposition of aggravated terms violated his right to a trial by jury under the Sixth and Fourteenth Amendments. For the reasons that follow, the Court DENIES his petition.

**I.     STATEMENT OF THE CASE**

Willis Lavone Creech was found guilty of three counts of assault with a firearm (Cal. Penal Code § 245(a)), four counts of shooting at an inhabited dwelling (Cal. Penal Code § 246), two counts of child endangerment (Cal. Penal Code § 273a(a)) and five personal

firearm use enhancements (Cal. Penal Code § 12022.5). Ex. 1 at 315-16, 325-38. Shortly thereafter, Creech was sentenced to 31 years and four months in state prison. Id. at 442. He is currently serving his sentence at Pleasant Valley State Prison.

In early 2010, the California Court of Appeal affirmed Creech's conviction in an unpublished decision. Ex. 9. The California Supreme Court subsequently denied Creech's petition for review. Ex. 11. Having properly exhausted his avenues for relief in state court, Carlson now petitions this Court for a writ of habeas corpus.

## II. STATEMENT OF FACTS

The California Court of Appeal summarized the facts of the case as follows:

Creech and his wife Reanna lived in Modesto with their four-year-old daughter Sofia and their three-year-old son Zachary. Creech was unemployed and Reanna worked at a Manteca hospital and attended nursing school. They argued frequently, and one evening got into an argument because Creech told her he had a shotgun. Reanna did not trust Creech with guns because he was unable to control his anger. When she learned during the argument that Creech had a loaded gun in the house, she became upset and decided to leave him because she believed her life would be at risk if she remained at home. Reanna did not tell Creech before she left because she was afraid she "wouldn't make it out the door." Reanna took the children to her father's house in rural Napa County, but she continued to work in Manteca.

A few days after the fight, Creech came to the hospital while Reanna was working. He asked for her and appeared agitated. Reanna locked herself in a bathroom and called for help. When Creech was confronted by a nursing supervisor and security officer, he left the hospital. Later that evening, Creech spoke to Reanna by telephone. He wanted to know where the children were, and Reanna told him they were at her father's. She was concerned that if she did not tell him, she could be charged with parental kidnapping because she had taken the children from him without any legal permission to do so. She suggested to Creech that they talk the following day to arrange for him to see the children.

Later that night, between midnight and 1:00 a.m., Creech arrived unannounced at Reanna's father's house, and he spoke with his father-in-law on the front porch. When Creech demanded to see his children, his father-in-law said they were sleeping and suggested to Creech that he come back the next day. Creech said he did not want to wait until morning and exchanged words with his father-in-law, but eventually got into his car and left. When Reanna returned to her father's house from work around 1:00 a.m., Creech was waiting there in his car. Reanna quickly drove away and Creech followed her. As Reanna was calling the sheriff's office from her cell phone, she was stopped by a highway patrol officer. She explained the circumstances and was escorted to her father's. When she spoke to sheriff's deputies, she told them she would speak to Creech "during normal hours."

Reanna was in her father's home late the next morning when she heard a "loud ... thud," and the sound of breaking glass. She looked through a window next to the front door and saw Creech outside holding a shotgun while standing about 15 to 20 feet away from the house. Reanna shouted to her stepsister Jennifer to grab Sofia, who was playing in the study at the front of the house. As Jennifer ran to the study,

2

she saw "glass ... flying everywhere." When Jennifer looked out a window in the study, she saw Creech standing about 15 to 30 feet away, aiming his shotgun and tracking her and Sofia with the barrel of the gun. Meanwhile, Reanna grabbed Zachary, dropped to the floor with him and sought cover in a downstairs bathroom where they were joined by Jennifer and Sofia.

Reanna's stepmother Juliane heard a "very loud pop" from the front of the house. She looked out the window and made eye contact with Creech, who was standing outside about 15 feet away from the front door, holding a shotgun. Reanna screamed, "he's gonna kill us, he's got a gun," and Juliane ran to lock the front door while Creech continued to shoot. There was a lot of loud yelling, and Sofia was "screaming her little head off." Juliane dialed 911, told everyone to go into the bathroom, and ran upstairs to get a handgun her husband had insisted on bringing into the house "in case [Creech] showed up." Juliane went out onto the upstairs porch intending to fire a warning shot, but had trouble operating the gun. Jennifer went upstairs to help her and they fired two warning shots.

Sheriff's deputies arrived minutes later. Creech was gone. The officers found three shotgun shells in the driveway in front of the home, and four shotgun "wads" or "shot collars" just in front of the front steps. The front door was perforated with many small holes in its wood surface that penetrated less than an eighth of an inch, and the outer pane of the double-paned window in the upper portion of the door was broken. Both layers of a double-paned window in the study were also broken. A sheriff's deputy and an investigator from the district attorney's office determined that a person standing in the driveway near where the shotgun shells were found would be able to see objects inside the study through the window.

Later that day, Newark police responded to a report of an attempted suicide at the home of Creech's parents, and found Creech lying on a bed unconscious. A search of Creech's home in Modesto uncovered a Mossberg shotgun owner's manual, a box of 12-gauge shotgun shells, and a recent computer printout with directions from the Modesto residence to St. Helena in the vicinity of Creech's father-in-law's home. A detective also found a cylindrical piece of metal under the front seat of a pickup truck rented to Creech.

Creech was charged with three counts of attempted murder, three counts of assault with a deadly weapon and by force likely to produce great bodily injury, four counts of shooting at an inhabited dwelling, and two counts of felony child endangerment. In connection with all counts other than shooting at an inhabited dwelling, it was also alleged that Creech personally used a firearm.

John Thornton was called as an expert in criminalistics and forensic science. He examined the scene and testified that the distribution and number of holes showed a shotgun was fired three times at the front door using number eight shot. Based on the location of the shotgun wads and expended shells, and the shot dispersal pattern on the door, he estimated the shooter was between 40 and 50 feet from the door when the shots were fired. Dr. Thornton also examined the broken window in the study and based on the blast pattern on the inner pane of glass, he concluded the shooter stood about 20 feet away when the shot was fired at the study window. The study had been cleaned before he inspected it, and Thornton saw no evidence of pellet strikes on the walls or furnishings of the study. But he found many pellets in the debris that was collected when the room was cleaned.

Dr. Thornton conducted ballistics tests using gelatin in order to calculate how far the shotgun pellets fired by Creech could penetrate human tissue. The tests showed that when fired from a distance of 45 feet, number eight pellets could have penetrated an

3

average of one and one half inches. When fired from the same distance through double-paned glass, there could have been no significant penetration. No tests were performed from any other distance. Dr. Thornton also determined that the metal tubing found in the truck rented to Creech was once part of the barrel of a 12-gauge Mossberg 500.

Brandi Rowe testified she had a prior relationship with Creech, and they had a child together. When he was angry, Creech would lose his temper and punch holes in the walls with his fists. He also kicked her when she was approximately six months pregnant. Creech also bought a shotgun during their relationship and when they argued, would tell Rowe "there's always one in the chamber." He once told her he had taken the gun along and followed her to school "and was just waiting for [her] to come out with some guy." Creech used to page Rowe with the number "187" when he was angry, and she understood it to be a reference to the Penal Code section defining murder.

The defense expert was James Norris, a forensic science consultant with a degree in chemistry who had experience working in forensics for various law enforcement agencies. Norris reviewed photos of the scene, police reports and transcripts of testimony. Based upon the pellet distribution and the location of a shotgun wad found near the study window, he opined that "the shot to the [study] window appeared to have come from, in general terms, about the same location [as] the other shot[s] to the front door." Thus, he estimated the shooter to have been about 50 feet from the window when he fired the shot, but he could not be sure because an element of chance also plays a part in where an expended shotgun wad will land.

Creech also testified and denied that he ever threatened his former girlfriend with his shotgun. He said that "everyone knew 187 ... it's an expression in page mail that you're upset with someone." He said he kicked Rowe when she was pregnant as a "last resort" to get her out of his way when he was leaving for work, and he denied that he followed her to school with a gun.

During the months leading up to the shooting, Creech testified that he and Reanna had financial difficulties, and they argued frequently. One of the things they argued about was whether he was actually Sofia and Zachary's father. Creech admitted he "hit the computer, and punched the wall, and pushed the door down" when he suspected Reanna of infidelity, but that DNA tests subsequently showed he was the children's father. Over the previous 10 years, he had broken things in anger, including the walls of the family home, about 20 to 25 times. He bought a Mossberg shotgun after a gang altercation in the neighborhood in order to protect his family, but he never kept it loaded and it had a child safety lock. When he told Reanna about the gun a couple of weeks after he purchased it, she expressed disbelief and disappointment that he had not told her about it earlier. When he showed her the gun, she looked "stunned." He later found her crying in the bedroom, but thought his explanation that he bought it because he had a duty to protect his family resolved the matter.

After the argument over the shotgun, Creech left and drove to his Mother's home. He frequently went for a drive after an argument to think things over. When he returned he was surprised to discover that Reanna had left with the children. She never told Creech that she intended to leave. When he got home and she was gone, Creech thought it might be good for the couple if he and Reanna spent some time apart. So, he decided to leave immediately to visit a cousin in Tennessee. He drove as far as New Mexico before he decided to turn around.

When he got home Creech went to the children's school. There he learned that Reanna had taken the children out of school for a week. This upset him and he went

4

back to the couple's apartment and threw all her belongings into the trash. He made many phone calls to people he knew looking for Reanna and the children. When he could not locate them, he went to Reanna's workplace as a "last resort."

After he left Reanna's workplace, Creech spoke to Reanna by phone. He told her he would do anything to save their marriage. But he claimed he had a right to own a gun and that he had it to protect her and the children. After the conversation with Reanna, Creech drove to her father's house. Although he arrived at midnight, Creech thought his father-in-law was "an understanding person" who would "invite [him] in" to see his children. When his father-in-law said "no" and told him they could "take care of that problem right now," Creech felt threatened. He knew his father-in-law owned weapons. He drove away from the house to obtain a cell phone signal, and did not know Reanna was driving a car that he followed away from the property. When he got a signal on his phone, he called sheriff's deputies and told them he was threatened when he tried to see his children.

There was a roadside meeting among sheriff's deputies, Creech, Reanna and her father. Creech became "very, very angry" after he heard his father-in-law tell the deputies that Creech could come back and see his children during the daytime. That was when he decided to take revenge on his father-in-law by shooting at his house. He drove back to Modesto, and decided to rent a different vehicle because he was concerned that law enforcement officers would recognize his car. He took his shotgun and number eight "bird shot" shells because he did not intend to cause "major damage." Although he had not slept in a long time, Creech drove back to his father-in-law's home. When he got there, the gate at the bottom of the driveway was locked. He saw vehicles outside the house, but not his wife's, and he saw no activity inside the house. He thought no one was at home. He was not wearing his usual glasses and could see no movement through the window of the study. It never occurred to him to ring the door bell or look in the window to make sure the children were not inside, and he never heard Sofia scream. He quickly fired four shots from a distance of 40 to 50 feet and drove away.

After the shooting, Creech stopped at a hardware store and bought a hacksaw to cut up his shotgun. He cut up the gun and threw away all the pieces except the one accidentally left under the seat of the rented truck. He also bought new clothes and discarded his old ones. He went to his parents' house in Newark, where he was told his father-in-law had called and said he faced charges of attempted murder. Creech thought his father-in-law was "railroading" him, and took a number of pills thinking his parents would call 911. He was later taken by ambulance to the hospital.

Creech claimed he did not intend to hurt his children or his wife's relatives, and did not see them in the house. When he was asked why he did not get rid of the gun to improve his relationship with Reanna, Creech answered, "Because we hadn't yet sat down and gotten to the bottom of it." After Reanna left their home, he resolved to heal their marriage, but it never occurred to him to get rid of the gun.

People v. Creech, No. A122199, 2010 WL 415451 (Cal. Ct. App. Feb. 5, 2010).

## III. STANDARD OF REVIEW

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

5

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. This standard is deliberately high: § 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," rather than a substitute for ordinary correction through appeal. Jackson v. Virginia, 443 U.S. 307, 332, n.5 (1979).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

6

Moreover, where the Supreme Court precedent is general in nature, courts have more leeway in reaching outcomes. See Harrington v. Richter, 131 S. Ct. 770, 786 (2011). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. —, — (2009).

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000); Avila v. Galaza, 297 F.3d 911, 918 n.6 (9th Cir. 2002); Packer v. Hill, 291 F.3d 569, 578-79 (9th Cir. 2002), rev'd on other grounds, 537 U.S. 3 (2002). It also looks to any lower court decision examined and/or adopted by the highest state court to address the merits. See Williams v. Rhoades, 354 F.3d 1101, 1106 (9th Cir. 2004).

Where the state court erred under § 2254(d), habeas relief is warranted only if the constitutional error at issue is structural or the error had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795-96 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)). A federal court cannot grant the writ based merely on a "reasonable possibility" that the constitutional error contributed to the verdict, but only where the petitioner "can establish that it resulted in actual prejudice." Morales v. Woodford, 388 F.3d 1159, 1171-72 (9th Cir. 2004).

**IV.     CLAIMS AND ANALYSIS**

Creech asserts two grounds for relief: (1) there was insufficient evidence to support his convictions for assault with a firearm and child endangerment, and (2) the imposition of aggravated terms violated his right to a trial by jury under the Sixth and Fourteenth Amendments.

**A.     Sufficiency of Evidence**

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

charged." In re Winship, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, see Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief. See, e.g., Wigglesworth v. Oregon, 49 F.3d 578, 582 (9th Cir. 1995). The federal court determines only whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. There has been a due process violation only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt. Id. at 324.

After AEDPA, a federal habeas court applies the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). To grant relief, the court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." Boyer v. Belleque, 659 F.3d 957, 964-65 (9th Cir. 2011). In sum, sufficiency claims on federal habeas review are subject to a "twice-deferential standard." Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012) (per curiam).

On habeas review, Creech first contends that there was insufficient evidence to convict him of assault with a firearm for two reasons: (1) he did not have the present ability to cause a battery, and (2) he was unaware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force.

In People v. Licas, the California Supreme Court held that "once a defendant has attained the means and location to strike immediately, he has the 'present ability to injure.'" 41 Cal. 4th 362, 366-67 (2007) (quoting People v. Valdez, 175 Cal. App. 3d 103, 113 (1985)). The California Supreme Court further held that "present ability to commit an assault is not negated . . . where suspects have acquired the means to inflict serious injury and positioned themselves within striking distance merely because, unknown to them,

8

1 external circumstances doom their attack to failure." People v. Chance, 44 Cal. 4th 1164, 1174 (2008).

On appeal and on habeas review, Creech argued that he lacked the present ability to cause a battery because his gun was loaded with bird shot of a low caliber, which could not have injured anyone from where he was standing, forty-five feet away. Creech emphasized that no one was injured in the shooting, and indeed, there was no evidence that bird shot pellets ever entered the house. Pet. at m-3, m-5.

The Court of Appeal rejected Creech's arguments, finding that he "had the means and location to inflict serious injury on the occupants when he fired his shotgun at the father-in-law's home while he was standing 45 feet from the front door." People v. Creech, 2010 WL 415451 at 6. The Court noted that one of the Creech's blasts "broke both panes of the window in the study occupied by his young daughter, Sofia," causing glass to fly into the room. Id. Furthermore, "when her aunt was taking Sofia out of the room, she could see [Creech] through the broken window tracking her with the barrel of his shotgun. Reanna's stepmother was also in harm's way. She ran to lock the front door while [Creech] was shooting at it." Id. On the basis of these facts, the Court held that "the jury could reasonably infer from the evidence that [Creech] had the present ability to inflict injury on Jennifer, Sofia, and Juliane." Id.

This Court agrees. Creech fired a shotgun at a window from less than twenty yards away. Assuming for the sake of argument that the bird shot could not have possibly entered the house, it is clear that the pellets could have and did shatter the window, causing shards of glass to fly into the room. As it is "the ability to inflict injury . . . that is determinative," and not whether any physical impact was sustained, a jury could reasonably find that the occupants of the house might have been injured by the shattering glass. Chance, 44 Cal. 4th at 1171. Moreover, Creech's present ability to commit an assault is not negated merely because, due to circumstances beyond the his control, the occupants of the house were not standing near the windows. See Id. at 1174. Thus, the state court's determination that a

9

1 rational jury could find beyond a reasonable doubt that Creech had the present ability to
2 inflict injury was not objectively unreasonable.

3       Creech further argued that he was unaware of the facts that would lead a reasonable
4 person to believe that his acts would directly and probably result in the application of force.
5 He contends that he was not aware that anyone was at home, since none of the family cars
6 were parked in front of the house. Pet. at m-9. Creech's argument is not persuasive, as he
7 admitted that he noticed three vehicles parked outside the house, yet he took no steps to
8 ascertain that the house was unoccupied, such as ringing the doorbell or looking into a
9 window. It was not unreasonable for a state court to conclude that a rational fact finder could
10 have concluded that a reasonable person would have been alerted to the presence of people
11 inside the home on the basis of the facts as Creech perceived them.

### B.     Right to a Trial by Jury

13       The Sixth Amendment affords criminal defendants the right to trial by an impartial
14 jury from the state and district in which the defendant allegedly committed the crime. With
15 regard to sentencing enhancements, "any fact that increases the penalty for a crime beyond
16 the prescribed statutory maximum must be submitted to a jury, and proved beyond a
17 reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 488-90 (2000).

18       California's Legislature adopted sentencing triads: three fixed sentences with no
19 ranges between them. Cunningham v. California, 549 U.S. 270, 293 (2007). In
20 Cunningham, the sentencing judge had no discretion to select a sentence other than twelve
21 years, nothing less and nothing more, unless he found facts allowing the imposition of a
22 sentence of either six or sixteen years. Id. The Court found that fact-finding to elevate a
23 sentence from twelve to sixteen years fell "within the province of the jury employing a
24 beyond-a-reasonable-doubt standard, not the bailiwick of a judge determining where the
25 preponderance of the evidence lies." Id. at 273.

26       The Cunningham court noted that California's determinate sentencing system could
27 remain as long as judges were permitted to "exercise broad discretion . . . within a statutory
28 range." Id. at 294 (citing United States v. Booker, 543 U.S. 220, 233 (2005)). To comply

1 with Cunningham, the California Legislature amended its sentencing structure; amended 2 California Penal Code § 1170(b) now provides that, "when a judgment of imprisonment is to 3 be imposed and the statute specifies three possible terms, the choice of the appropriate term 4 shall rest within the sound discretion of the court."

Creech contends that the revised sentencing system, where a court has the discretion to select among the lower, middle, or upper term, does not comply with Cunningham. He argues that the sentencing judge's discretion is severely restricted because the judge is still limited to the imposition of one of the three terms. Moreover, the court looks to the same pre-Cunningham mitigating and aggravating factors, makes factual findings, and based on those findings imposes one of three terms. Pet. at m-18. As such, Creech argues that "the new system has courts doing the exact same thing as they were doing before, just under different labels." Id.

To succeed on habeas review, Creech must demonstrate that the state court's decision involved an objectively unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. The California Supreme Court has concluded that the system Creech challenges is constitutional, see People v. Sandoval, 41 Cal.4th 825 (2007) (holding that judicial discretion to impose a lower, middle, or upper term complied with Cunningham), and the state court cited that conclusion in denying Creech's claim.

This Court has already rejected an identical habeas argument advanced by the petitioner in McCowan v. Marshall, No. C 10-0473 CRB PR, 2011 WL 1544490 (N.D. Cal. Apr. 25, 2011) (state court rejection of challenge to revised scheme was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent), and at least one other federal district court has reached the same conclusion, see Juarez v. Allison, CV 10-10001-GW E, 2011 WL 3654449 (C.D. Cal. Mar. 22, 2011) report and recommendation adopted, CV 10-10001-GW E, 2011 WL 3625583 (C.D. Cal. Aug. 16, 2011). Creech has offered no reason for this Court to revisit its reasoning in McCowan.

1  Because the state court committed no error, this Court does not reach the issue of whether
2  any error would have been harmless.
3       Accordingly, Creech's petition for a writ of habeas corpus is DENIED.
4  **IT IS SO ORDERED.**

6  Dated: July 11, 2013             CHARLES R. BREYER
                                               UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California